### The City of Coldwater v. Chester S. Tucker.

*Municipal corporations: Exercising powers beyond their limits.*   The general doctrine is clear, that a municipal corporation cannot usually exercise its powers beyond its own limits; and if it has in any case authority to do so, the authority must be derived from some statute which expressly or impliedly permits it.

## COLDWATER v. TUCKER.

*Cities: Contracts: Public works outside their limits.* The query is suggested, whether, even by contract, a city can build or possess public works beyond its limits, without plain permission of the legislature.

*Cities: Sewerage: Extension beyond city limits: Necessity: Implied authority.* The authority of a city to provide sewerage beyond the city limits may be implied from the existence of a state of facts which renders it actually necessary or manifestly desirable, as where a city, though bounded by a stream, is required by its charter to preserve the stream from pollution and prevent the depositing of filth therein, and no other outlet is reasonably available except through means of ditches extending beyond the limits.

*Sewers: Outlet beyond city limits: Discretion.* And where the drainage requires an outlet beyond the city limits, and the surroundings are such as to raise the implication of authority in the city to conduct the work beyond its limits, the city must be permitted to retain some discretion as to the arrangements by which it shall accomplish the purpose; and there is no legal obstacle to its undertaking to do this work by its own servants or contractors, instead of employing the owner of the premises. to do it.

*Drainage: Cities: Outlet: Contract to extend and enlarge ditch: Corporate powers.* A city thus situated having led its sewer to the city limits, where it emptied into a county ditch, which was found to be inadequate, made a contract with the adjoining proprietor to enlarge and straighten the ditch through his premises, so as to provide for carrying off all the water without overflowing or saturating his land, agreeing to keep the ditch in repair, not to injure or obstruct the cross-ditches, and to maintain a good bridge across it on his premises:—

*Held,* That the work undertaken by the city could not be regarded as repugnant or foreign to the purposes of its charter, and that the contract was not beyond the corporate powers.

*Contract: Construction: Extraordinary and unexpected floods.* The undertaking by the city in such contract to make the ditch sufficient to carry off all water without overflowing or saturating the adjoining premises, cannot be construed to obligate the city to make provision for extraordinary and unexpected floods, or to put the proprietor in any better condition than he would have been with the ditch as it was before and with the extra city flowage excluded.

*Contract: Neglect in repairs: Arbitration: Damages: Forfeiture.* The contract having made provision for a settlement by arbitration for any mischief caused by neglect in repairs, this indicates a design that such neglect should not terminate the contract, unless the failure were so great as to amount to a practical abandonment of the contract obligation.

*Contract: Injunction: Drainage: Obstruction.* The city in making the improvement in the first instance having in good faith substantially complied with its obligation, and constructed a ditch apparently satisfactory at the time to the other party to the contract, and no serious fault or neglect being established against the city, injunction is granted to restrain the owner of the premises from filling in the ditch so as to obstruct the city flowage.

*Heard April 11. Decided June 6.*

Appeal in Chancery from Branch Circuit.

*Loveridge & Barlow* and *Upson & Thompson,* for complainant.

*J. H. McGowan* and *Ashley Pond,* for defendant.

CAMPBELL, J:

The bill in this case was filed to restrain defendant from obstructing a ditch through his lands adjoining the city of Coldwater, which he is alleged to have attempted in violation of an agreement whereby a right was assured to the city to use it for an outlet of drainage.

It appears that in 1862, or thereabouts, a county ditch was laid out through defendant's lands and lands north of them to a branch of Coldwater river. The city of Coldwater, lying immediately south of Tucker, had by drainage, partly natural and partly artificial, turned the surface water of a considerable tract into the county ditch. A lawsuit having grown out of this action, a compromise was effected; and on the 9th of March, 1867, an agreement in writing was made, which, among other things, provided that Tucker would allow the ditch across his premises to be enlarged so as to carry off the water from the city ditch, upon condition that the city should enlarge and straighten his ditch and the continuation of it northerly, so as to provide for carrying off all water without overflowing or saturating his land. The city was to keep the ditch in repair and keep up a good bridge across it on his premises, and the cross-ditches were not to be injured or obstructed. All damages were to be arbitrated.

The active work to be done was all to be done by the city, as well in maintaining and repairing as in enlarging the ditch. The city could at any time terminate its obligations by shutting off the flow from its own territory.

It is not denied that Tucker has obstructed the flow of the water. His defense is: *First,* That the city is in default; and *second,* that it had no authority to make the contract and cannot, therefore, enforce it or be compelled to carry it out.

The charter of the city,—which was granted in 1861,—contains no express authority to execute drainage works beyond the city limits. It does contain general authority over drainage. It is not insisted that any right would have existed to turn the drainage in question upon Tucker's land, if there had been no ditch across it, or in such case to dig such a ditch without his consent. . The case shows that the ditch existing there was dug as a county ditch after the city was incorporated, and was not designed, and was not adequate, in its original shape, to serve the purpose provided for in the contract.

At the time when the county ditch was dug, there was no statute in force providing for any combined action between the drain commissioners and the city authorities, or authorizing county ditches to extend into cities. In February, 1867, an amendatory statute was passed, giving commissioners authority, with the consent of the corporate council or trustees, to extend ditches into cities and villages and assess the expense as in other cases.—*L. 1867, pp. 3, 4.* How far this statute operated in leading the parties to a settlement immediately after its passage, we are not informed. But they seem to have preferred arrangements of their own to leaving the matter to be managed by the commissioners.

By this contract the city undertook to do certain work outside of its own limits, where its power to secure the result bargained for depended on its power to make a private contract with outside landowners, and not upon any statutory or chartered authority. The ditch itself was laid out under the supervision of the drain commissioners, and the right to enlarge it without the consent of the landowners, could only be obtained by statutory proceedings under their authority. And whether enlarged or not, the work was not under city jurisdiction. If the contract was valid, the city acted, so far as this work was concerned, in the same right as a private person, contracting to do work on the land of another.

The general doctrine is clear that a municipal corpora-

tion cannot usually exercise its powers beyond its own limits. If it has in any case authority to do so, the authority must be derived from some statute which expressly or impliedly permits it. There are cases where considerations of public policy have induced the legislature to grant such power. The commonest instances are, where a supply of water can only be obtained from a distance. Where the city erects its own works or lays its own pipes for such a purpose, it has usually been found necessary, in order to furnish adequate safeguards for the preservation of the property, to pass special statutes to cover the case. There would be serious difficulties attending the management of expensive public works situated in one town or city, and owned by another, unless expressly provided for. If a city cannot regulate and protect its public works against injuries and interference, they are liable to serious dangers. The noted case of *Bailey v. Mayor, etc., of New York, 3 Hill, 531,* and *2 Denio, 433,* illustrates some of the complications arising from the necessity of going beyond the limits of a city for water. In the absence of any sufficient legislation to overcome the difficulty, the power to make provision for outside work, if existing at all, can only be exercised by resorting to contracts to obtain rights and privileges which, within the city, can generally be secured, if necessary, by proceedings *in invitum.* It would still be an important question, whether, even by contract, a city can build or possess public works beyond its limits, without plain permission.

In the present case, for example, if there can be any implication that sewerage may be provided beyond the city, it must arise from the existence of a state of facts which renders it either actually necessary, or at least manifestly desirable. It is easy to see that the practical necessity of removing sewerage beyond city limits must very often arise. Drainage, whether of surface water or of impurities, can seldom be effectual unless connected with running water which will remove it beyond the inhabited limits. Public health and convenience require this resort. A power to

"construct, repair, and preserve sewers, drains," etc., would be useless unless they could be connected with some safe outlet. In the present case, it appears that a branch of the Coldwater river is a city boundary. But it also appears from the charter, that the pollution of that stream was designed to be prevented. One of the special powers of the city is "to provide for the clearing the Coldwater river, and races connected therewith, of all drift-wood, filth, or other nuisances, and to prohibit and prevent the depositing therein of all filthy and other matter tending to render the water thereof impure, unwholesome, or offensive."—§ *10*. This makes it the duty of the city to find drainage, if possible, where it will not produce these evils, and there seems to be no reason why an outlet should not be sought elsewhere, provided the charter furnishes the means of obtaining one, expressly or by fair implication.

If it can only be obtained by building a sewer or ditch beyond the city, the charter seems to be defective, in making no express provision for such works. But if by leading a sewer or ditch to the city limits it can be connected with an outlet beyond, there would seem to be no reason for preventing such connection. Drainage is a public necessity.

In the present case, such an outlet was supposed to exist, but it was not large enough, and it could not be used without permission. The contract in dispute was made to secure the enlargement of the ditch, and the right to connect it with the city ditch, already existing up to the city boundary, which was practically useless without this outlet.

While there are very serious difficulties in the way of controlling and protecting such works outside of the city, yet if the drainage is to find an outlet beyond the city limits, it must be somewhat discretionary with the city to make such arrangements as might be made by natural persons for similar purposes. We can see no legal objection to an undertaking by the city to do this work by its own servants or contractors, instead of employing Tucker to do it. It is

not only usual, but it is frequently obligatory to let city jobs to contractors on bids, and it was not unreasonable to retain control, so far as Tucker was willing to permit it, so as to give the city a choice of means as occasion should arise for doing work or making repairs.

We think, therefore, that the work in question cannot be regarded as repugnant or foreign to the purposes of the charter, and that the contract was not beyond the corporate powers.

The question next arises, whether complainants have lost their rights under the contract.

The defense on this point rests on the claim that the ditch was not properly constructed, and was not large enough to carry off all the water. It is claimed that the lands of Tucker have been overflowed and damaged, and that the ditch has produced saturation of the soil to an amount which has led to mischief. There is also a claim that the bridge over the ditch has not been kept in order.

The evidence shows that the ditch in question passes through a part of Tucker's land somewhat higher than a portion lying east of it, and that this land has been at times submerged, and has continued so long enough to interfere with its profitable culture. The testimony, however, is conflicting upon both cause and effect, and does not lead to entirely satisfactory results on either side. The damage from the condition of the bridge is of very small account in any event.

Of course it cannot be supposed that the object of the contract with Tucker was to put him in any better condition than he would have been had the old ditch remained as it was, and the extra city flowage been excluded. Neither can it be held requisite, for the same reason, that the new or enlarged ditch should be made adequate for extraordinary and unexpected floods.

There is nothing to show that the enlargement when made was not entirely satisfactory to Tucker, nor that it was not really adequate so far as any judgment or experi-

ence could then determine. It seems to have been made amicably and in good faith. We think that the proof does not sustain the claim that the water does not flow freely beyond Tucker's land to the north. The impression made on our minds by the whole evidence is, that the deficiency in drainage of Tucker's surface soil arises chiefly from his failure to dig a sufficient number of lateral drains to relieve the land. It is claimed, but we do not think it is very well established, that these drains were obstructed by the fault of the city. On the contrary, we think they appear to have worked as well as their construction was likely to make them. No human foresight can prevent the effects of a cold and snowy winter on an open ditch, or provide immediate way for the waters gathering after an unusual and violent storm. Sluices large enough for every such emergency would be extravagant in cost and wasteful in the appropriation of land.

We cannot avoid the conclusion that the city in digging out and maintaining this ditch has substantially complied with its obligation. For any mischief caused by neglect in repairing deficiencies, the contract provides that there shall be a settlement by arbitration. This, we think, indicates a design that such neglect shall not terminate the contract, unless the failure is so great as to amount to a practical abandonment of the contract obligation. This agreement was made to subserve purposes of public health and convenience, and not on private grounds. Any obstruction of the city ditch must work irreparable mischief, reaching far beyond the inconvenience of private landholders. Such mischief as Tucker is likely to feel from the neglect of the city can, for the most part, if not entirely, be obviated at small expense. The city could probably, had it seen fit, have secured the same end, with no more expense to its citizens, and with no greater convenience to Tucker, by calling in the aid of the drain commissioners. He has no right to take the law into his own hands, and abrogate a contract designed to be permanent, merely because mischiefs may have arisen which the agreement expressly recognizes

·as possible, and against losses from which it provides a special form of redress.

We think the court below was right in rendering a decree enjoining the defendant from interfering with the ditch. The decree must be affirmed, with costs.

The other Justices concurred.