[L.A. No. 24909. In Bank. Aug. 29, 1958.]

SOUTHERN CALIFORNIA GAS COMPANY (a Corporation), Respondent, v. CITY OF LOS ANGELES, Appellant.

714

Roger Arnebergh, City Attorney, Bourke Jones, Assistant City Attorney, and Claude E. Hilker, Deputy City Attorney, for Appellant.

Harold W. Kennedy, County Counsel (Los Angeles), and Edward H. Gaylord, Deputy County Counsel, as Amici Curiae on behalf of Appellant.

T. J. Reynolds, L. T. Rice, Allen L. Cleveland, C. R. Salter, Bates Booth, Arville A. Armstrong, Jr., and Gertrude Greengard for Respondent.

Gibson, Dunn & Crutcher, Norman S. Sterry, Ira C. Powers, Martin E. Whelan, Jr., F. T. Searls, P. E. Sloane, W. E. Johns and R. A. Clarke as Amici Curiae on behalf of Respondent.

TRAYNOR, J.—The city of Los Angeles constructed the La Cienega and San Fernando Relief Sewer as part of a sewer construction program. A short section of this sewer line

passes under a narrow strip of land known as the County Strip located outside the city limits in an unincorporated area of the county of Los Angeles. To construct the sewer it was necessary to relocate gas lines of the Southern California Gas Company. The company agreed to relocate its gas lines in the County Strip subject to a later determination of its obligation to do so at its own expense. It conceded its obligation to relocate its lines at its own expense within the city limits but denied that it had the same obligation with respect to its lines located in the County Strip. After the work was completed it brought this action against the city to recover the costs incurred in relocating its County Strip lines and recovered judgment for $12,003.92 plus interest. The city appeals.

The company located its lines in the county pursuant to a county franchise. It is not disputed that this franchise constitutes a contract secured by the United States Constitution against impairment by subsequent state legislation (see *County of Los Angeles* v. *Southern Cal. Tel. Co.*, 32 Cal.2d 378, 382 [196 P.2d 773]) and that the company's rights thereunder can not be taken or damaged for public use without making just compensation. (Cal. Const., art. I, § 14; U.S. Const., Amend. 14, § 1; *Russell* v. *Sebastian*, 233 U.S. 195 [34 S.Ct. 517, 58 L.Ed. 912, L.R.A. 1918E 882]; *United States* v. *Brooklyn Union Gas Co.*, 168 F.2d 391, 394; *City of Petaluma* v. *Pacific Tel. & Tel. Co.*, 44 Cal.2d 284, 288 [282 P.2d 43].) Accordingly it is necessary to determine what those rights are.

In the absence of a provision to the contrary it has generally been held that a public utility accepts franchise rights in public streets subject to an implied obligation to relocate its facilities therein at its own expense when necessary to make way for a proper governmental use of the streets. (*New Orleans Gaslight Co.* v. *Drainage Com.*, 197 U.S. 453, 461-462 [25 S.Ct. 471, 49 L.Ed. 831]; *Chicago B. & Q. Railway* v. *Illinois*, 200 U.S. 561, 586 [26 S.Ct. 341, 50 L.Ed. 596]; *Transit Com.* v. *Long Island R. Co.*, 253 N.Y. 345 [171 N.E. 565, 566]; *Southern Bell Tel. & Tel. Co.* v. *Commonwealth*, (Ky.) 266 S.W.2d 308, 310; *Southern Bell Tel. & Tel. Co.* v. *State*, (Fla.) 75 So.2d 796, 800; *Western Gas Co. of Washington* v. *City of Bremerton*, 21 Wn.2d 907 [153 P.2d 846, 847]; *In re Delaware River Joint Com.*, 342 Pa. 119 [19 A.2d 278, 280]; *Natick Gaslight Co.* v. *Inhabitants of Natick*, 175 Mass. 246 [56 N.E. 292, 293]; *Opinion of the Justices*,

—— Me. —— [132 A.2d 440, 443]; *Opinion of the Justices,* —— N.H. —— [132 A.2d 613, 614].) ■ The laying of sewers is a governmental as distinct from a proprietary function under the foregoing rule. (*Detroit Edison Co.* v. *City of Detroit,* 332 Mich. 348 [51 N.W.2d 245, 247-248]; *Louisville Gas & Electric Co.* v. *Commissioners of Sewerage of Louisville,* 236 Ky. 376 [33 S.W.2d 344, 344-345]; *Nicholas Di Menna & Sons* v. *City of New York,* 114 N.Y.S.2d 347, 350; *Portland Gas & Coke Co.* v. *Giebisch,* 84 Ore. 632 [165 P. 1004, L.R.A. 1917E 1092]; *City of San Antonio* v. *San Antonio St. Ry. Co.,* 15 Tex. Civ. App. 1 [39 S.W. 136, 138]; *Anderson* v. *Fuller,* 51 Fla. 380 [41 So. 684, 688, 120 Am.St.Rep. 170, 6 L.R.A.N.S. 1026]; *National Water-Works Co.* v. *City of Kansas,* 28 F. 921, 922-923; *cf. City of Los Angeles* v. *Los Angeles Gas & Elec. Corp.,* 251 U.S. 32, 39-40 [40 S.Ct. 76, 64 L.Ed. 121]; *State ex rel. Speeth* v. *Carney,* 163 Ohio St. 159 [126 N.E.2d 449, 460]; *Postal Tel.-Cable Co.* v. *City & County of San Francisco,* 53 Cal.App. 188, 192-193 [199 P. 1108].) *Panhandle etc. Co.* v. *State Highway Com.,* 294 U.S. 613 [55 S.Ct. 563, 79 L.Ed. 1090], is not to the contrary, for in that case the utility's private right of way was involved, not its right to use the public streets.

■ The company contends, however, that any implied obligations in its county franchise to relocate its pipes cannot be invoked for the benefit of the city operating outside its territorial limits. We cannot agree with this contention. Such obligations rest on the paramount right of the people as a whole to use the public streets wherever located, and the fact that a franchise is granted by one political subdivision as an agent of the state (see *San Francisco-Oakland Terminal Rys.* v. *County of Alameda,* 66 Cal.App. 77, 83 [225 P. 304]; *Belfast Water Co.* v. *City of Belfast,* 92 Me. 52 [42 A. 235, 237]) does not defeat the right of another such agent acting in its governmental capacity to invoke the public right for the public benefit. (*First Nat. Bank of Boston* v. *Main Turnpike Auth.,* 153 Me. 131 [136 A.2d 699, 711]; *City of San Antonio* v. *Bexar Metropolitan W. Dist.,* (Tex. Civ. App.) 309 S.W.2d 491, 493; *Cummins* v. *City of Seymour,* 71 Ind. 491 [41 Am.Rep. 618, 623-625]; *New Orleans Gaslight Co.* v. *Drainage Com.,* 111 La. 838 [35 So. 929, 933]; see *Gadd* v. *McQuire,* 69 Cal.App. 347, 358-359 [231 P.2d 754].) ■ The fact that the city's use of county streets for its sewers is authorized by section 10101 of the Public Utilities Code has no bearing on the applicability of the foregoing rule. ■ It is

true that the rights granted to municipal corporations by that section have been held to constitute franchises subject to the paramount right of the state to make the streets safe for public travel (*State* v. *Marin Mun. W. Dist.*, 17 Cal.2d 699, 703-704 [111 P.2d 651]), but it does not follow that a franchise exercised by a city in its governmental capacity under that section is subordinate to a prior franchise granted to a public utility. The utility involved in the Marin case was a municipal water district operating in a proprietary capacity. (See *City of South Pasadena* v. *Pasadena Land etc. Co.*, 152 Cal. 579, 592-593 [93 P. 490].) ▇ In the present case, on the other hand, the city is exercising one of its most important governmental powers, a power so important that it is one of the few powers it may exercise outside of its territorial limits without express authorization. (*Harden* v. *Superior Court*, 44 Cal.2d 630, 638-639 [284 P.2d 9]; *Mulville* v. *City of San Diego*, 183 Cal. 734, 737 [192 P. 702]; *McBean* v. *City of Fresno*, 112 Cal. 159, 163 [44 P. 358, 53 Am.St.Rep. 191, 31 L.R.A. 794]; see also *City of National City* v. *Fritz*, 33 Cal.2d 635, 637 [204 P.2d 7]; *City of Madera* v. *Black*, 181 Cal. 306, 312-313 [184 P. 397].) The Marin case itself recognized and applied the established rule that a utility's rights in the public streets are taken subject to the paramount right of public travel, and as stated above, the same rule applies between public utilities and municipal corporations using the streets for sewer purposes.

The company contends, however, that the express terms of its county franchise define its obligation to relocate its lines at its own expense and that by clear implication any other similar obligations are excluded. Section 8 of its franchise provides that "the County of Los Angeles reserves the right to change the grade of any highway over which this franchise is granted, and the grantee of said franchise, its successors or assigns, shall at once change the location of all pipes and other appliances laid hereunder to conform to such change of grade." The city contends that the recital of the obligation to relocate the gas lines for changes of grade does not exclude other implied obligations to relocate lines and that any attempt to relieve the company of such obligations would be invalid.

▇ The right of municipal corporations to require utilities to relocate their lines to make way for governmental uses of the streets has usually been described as resting in the police power, and it has frequently been stated in this context that the police power cannot be bargained away. (*National Water-*

*Works Co.* v. *City of Kansas,* 28 F. 921, 922-923; *City of Macon* v. *Southern Bell Tel. & Tel. Co.,* 89 Ga. App. 252 [79 S.E.2d 265, 275]; *Belfast Water Co.* v. *City of Belfast,* 92 Me. 52 [42 A. 235, 237]; *Louisville City Ry. Co.* v. *City of Louisville,* 71 Ky. (8 Bush) 415, 422-423; *Scranton Gas & Water Co.* v. *City of Scranton,* 214 Pa. 586 [64 A. 84, 85, 6 L.R.A.N.S. 1033]; *Louisville Gas & Electric Co.* v. *Commissioners of Sewerage of Louisville,* 236 Ky. 376 [33 S.W.2d 344, 344-345]; see *New Orleans Gaslight Co.* v. *Drainage Com.,* 197 U.S. 453, 460 [25 S.Ct. 471, 49 L.Ed. 831].) Given, however, the municipal power to vacate streets or acquire a lesser interest in them in the first instance than is usually obtained by the public (see *Pennsylvania Coal Co.* v. *Mahon,* 260 U.S. 393, 416 [43 S.Ct. 158, 67 L.Ed. 322, 28 A.L.R. 1321]; *Detroit Edison Co.* v. *City of Detroit,* 332 Mich. 348 [51 N.W. 2d 245, 247-248]), there would appear to be no basic principle that would prohibit granting a utility a right to compensation for relocating its lines as part of its franchise although such right would not otherwise pass. This view finds support in cases holding that the Legislature may provide for such compensation. (*In re Gillen Place, Borough of Brooklyn,* 304 N.Y. 215 [106 N.E.2d 897, 900]; *Baltimore Gas & Electric Co.* v. *State Roads Com.,* 214 Md. 266 [134 A.2d 312, 315]; *Philadelphia Sub. W. Co.* v. *Pennsylvania P. U. Com.,* 168 Pa. Super. 360 [78 A.2d 46, 51-52]; *Opinion of the Justices,* —— Me. —— [132 A.2d 440, 443]; *Opinion of the Justices,* —— N.H. —— [132 A.2d 613, 614-615]; see *Columbus Gaslight & Coke Co.* v. *City of Columbus,* 50 Ohio St. 65 [33 N.E. 292, 293, 40 Am.St.Rep. 648, 19 L.R.A. 510].)\* Perhaps this apparent conflict can be reconciled on the theory that a state Legislature may authorize franchises granting the utility the right to compensation for relocating its lines to make way for governmental uses, but that it will not be held to have delegated such power to a political subdivision in the absence of express language to that effect. It is unnecessary to determine, however, whether the county was empowered to grant a franchise including the right to the compensation here sought, for we have concluded that properly interpreted the company's franchise included no such right.

As a public grant the franchise is to be construed in

---

\*It should be noted that we are not here concerned with the question of the power of the Legislature to grant additional rights under a franchise after it has been accepted by the utility and the problem that would be raised thereby of a possible gift of public funds.

favor of the public interest. (*Knoxville Water Co.* v. *Knoxville,* 200 U.S. 22, 33-34 [26 S.Ct. 224, 50 L.Ed. 353] ; *County of Los Angeles* v. *Southern Cal. Tel. Co.,* 32 Cal.2d 378, 384 [196 P.2d 773] ; *City of Sacramento* v. *Pacific Gas & Electric Co.,* 173 Cal. 787, 791 [161 P. 978] ; Civ. Code § 1069.) Its own terms provide that it "is hereby granted upon each and every condition herein contained, and shall ever be strictly construed against the grantee and its successors and assigns. Nothing shall pass hereby unless it be granted in plain and unambiguous terms." ▆▆ The maxim *expressio unius exclusio alterius est* cannot be invoked to make plain and unambiguous the right to compensation that the company seeks. Given the parties' express recognition of the rule of strict construction against the grantee, paragraph 8 cannot reasonably be interpreted as being more than a partial expression of the parties' common-law rights and obligations (*City of Los Angeles* v. *City of Glendale,* 23 Cal.2d 68, 77 [142 P.2d 289] ; *Strand Improvement Co.* v. *City of Long Beach,* 173 Cal. 765, 772-773 [161 P. 975]) inserted out of an abundance of caution or by way of example only. (*City of Lexington* v. *Commercial Bank,* 130 Mo. App. 687 [108 S.W. 1095, 1096] ; *Georgia Power Co.* v. *Leonard,* 187 Ga. 608 [1 S.E.2d 579, 581] ; see also *Springer* v. *Philippine Islands,* 277 U.S. 189, 206 [48 S.Ct. 480, 72 L.Ed. 845] ; *Dickey* v. *Raisin Proration Zone No. 1,* 24 Cal.2d 796, 811 [151 P.2d 505, 157 A.L.R. 324].) Thus, the New York Court of Appeals has pointed out that despite the existence of express provisions dealing with the utility's obligations with respect to the streets "The reasonable construction . . . is to assume that the people are not to be burdened with any heavier expense than necessity requires, and that to relieve the public service corporations having franchises in the streets of their common-law liabilities and to pass them over to the taxpayer can only be accomplished by the express direction of the Legislature." (*Transit Commission* v. *Long Island R. Co.,* 253 N.Y. 345 [171 N.E. 565, 568] ; see also *New York Tunnel Authority* v. *Consolidated Edison Co.,* 295 N.Y. 467 [68 N.E.2d 445, 448-449].) *Chicago* v. *Sheldon,* 9 Wall. (U.S.) 50 [19 L.Ed. 594], *State* ex rel. *City of Kansas* v. *Corrigan Consol. Street Ry. Co.,* 85 Mo. 263 [55 Am.Rep. 361], *City of Kansas* v. *Corrigan,* 86 Mo. 67, and *Western Union Tel. Co.* v. *Police Jury,* 225 La. 531 [73 So.2d 450], are not to the contrary. The first three of these cases involved, not competing uses of the streets, but the extent of the utility's duty to repair and repave the streets,

a matter covered by the express terms of the franchise, and in the Sheldon case the court's interpretation was in accord with the practical construction placed on the franchise by the parties. In the fourth case, the competing public use was so highly unusual that it could not have been contemplated at the time the franchise was accepted. In the present case, on the contrary, the use of the streets for sewers was clearly to be anticipated, the utility's common-law obligation to relocate its pipes to accommodate that use has at all times been clearly recognized by the law, and there is no provision in the company's franchise abrogating that obligation by giving it the right to recover the costs of such relocation.

The judgment is reversed with directions to the trial court to enter judgment for the defendant city.

Gibson, C. J., Shenk, J., and Spence, J., concurred.

CARTER, J., Concurring.—Although I agree with the conclusion reached in the opinion prepared by Mr. Justice Traynor, for the reasons hereinafter stated, I regret my inability to join in said opinion.

My views with respect to the application of article I, section 14, of the Constitution of California to the ordinary situation in which private property has been taken or damaged for a public use, have been stated many times in both majority, dissenting and concurring opinions which I have written as a member of this court (*Rose* v. *State*, 19 Cal.2d 713 [123 P.2d 505]; *Bacich* v. *Board of Control*, 23 Cal.2d 343 [144 P.2d 818]; *Archer* v. *City of Los Angeles*, 19 Cal.2d 19, 29 [119 P.2d 1]; *O'Hara* v. *Los Angeles County Flood etc. Dist.*, 19 Cal.2d 61, 64 [119 P.2d 23]; *House* v. *Los Angeles County Flood Control Dist.*, 25 Cal.2d 384, 398 [153 P.2d 950]; *Clement* v. *State Reclamation Board*, 35 Cal.2d 628, 646 [220 P.2d 897]). It will be noted that in all of the cases above cited it was the position of the public agency which took the property or caused damage thereto, that the taking or damaging was done under the police power reserved to the state and its political subdivisions by article XI, section 11, of the Constitution of California. I did not agree with this contention, and my position in this regard is the same now as it was then. This is the first case since I have been a member of this court, in which, in my opinion, the police power doctrine was applicable to the facts of the case presented. A review of the above-cited cases reveals a state of confusion in the

minds of some members of this court with respect to the situations in which the police power doctrine may be invoked by the state or a political subdivision thereof to take, damage or destroy private property without the payment of compensation therefor in contravention of article I, section 14, of the Constitution of California. (See *Rose* v. *State, supra; Bacich* v. *Board of Control, supra; Archer* v. *City of Los Angeles, supra; O'Hara* v. *Los Angeles County Flood etc. Dist., supra; House* v. *Los Angeles County Flood Control Dist., supra; Clement* v. *State Reclamation Board, supra; Beals* v. *City of Los Angeles,* 23 Cal.2d 381 [144 P.2d 839] ; *People* v. *Ricciardi,* 23 Cal.2d 390 [144 P.2d 799].) A reading of the last-cited cases including the dissenting and concurring opinions therein demonstrates the truth of my statement with respect to the confusion which has existed in the minds of some members of this court in attempting to distinguish cases involving the application of article I, section 14 (eminent domain), of the Constitution and cases involving the application of article XI, section 11 (police power), of the Constitution of California. The opinion prepared by Mr. Justice Traynor in this case adds to that confusion, as he fails to differentiate between the powers granted to the state and its political subdivisions under the last two cited constitutional provisions. Said opinion states: ''In the present case, on the other hand, the city is exercising one of its most important governmental powers, a power so important that it is one of the few powers it may exercise outside of its territorial limits without express authorization.'' He then cites *Harden* v. *Superior Court,* 44 Cal. 2d 630 [284 P.2d 9], which is a case involving power of eminent domain. Later in his opinion, he states: ''The right of municipal corporations to require utilities to relocate their lines to make way for governmental uses of the streets has usually been described as resting in the police power, and it has frequently been stated in this context that the police power cannot be bargained away.'' The cases he cites here correctly apply the police power doctrine.

In said opinion, Mr. Justice Traynor also discusses the power of the Legislature to provide for the payment of compensation in cases such as this, but this proposition is not involved here because it is conceded that the Legislature made no such provision. This discussion is therefore obiter dictum.

There is really no need for the confusion which now exists in the decisions of this court which have had occasion to apply article I, section 14, and article XI, section 11, of the

Constitution of California to particular factual situations as there is a clear distinction between the power of eminent domain and the police power granted by said constitutional provisions. It may be true that there is a twilight zone where the line of demarcation between the exercise of the power of eminent domain and the exercise of the police power is difficult to discern, but in view of the very clear pronouncements of the Supreme Court of the United States in this field, this is not such a case. I say this, notwithstanding my predilection to hold otherwise before reading the decisions of the Supreme Court of the United States applicable to the facts of this case. (*New Orleans Gaslight Co. v. Drainage Com.*, 197 U.S. 453 [25 S.Ct. 471, 49 L.Ed. 831] ; *Chicago, Burlington etc. R. R. Co. v. Chicago,* 166 U.S. 226 [17 S.Ct. 581, 41 L.Ed. 979] ; *Chicago B. & O. Ry. Co. v. Illinois Commrs.,* 200 U.S. 561 [26 S.Ct. 341, 50 L.Ed. 596] ; *New York & N. E. Railroad Co. v. Bristol,* 151 U.S. 556 [14 S.Ct. 437, 38 L.Ed. 269] ; *Butchers' Union etc. Co. v. Crescent City etc. Co.,* 111 U.S. 746 [4 S.Ct. 652, 28 L.Ed. 585] ; *Stone v. Mississippi,* 101 U.S. 814 [25 L.Ed. 1079] ; *New Orleans Gaslight Co. v. Louisiana Light etc. Co.,* 115 U.S. 650, 671 [6 S.Ct. 252, 29 L.Ed. 516].) In view of these decisions, we have here a very simple case which should be disposed of by an opinion free from the confusion and dictum which permeates many of the other decisions of this court in this field. For the sake of clarity only, I have prepared an opinion which correctly states and disposes of the issues in this case in accordance with the rules of law as declared by the Supreme Court of the United States to be applicable to the factual situation presented here.

Defendant, city of Los Angeles, a municipal corporation, appeals from a judgment awarding compensation to plaintiff, Southern California Gas Company, a corporation, for its costs in relocating its gas lines. The case was tried on an agreed statement of facts.

The city of Los Angeles, hereinafter referred to as the city, began a sewer construction program, one of the main parts of which was the construction of the "La Cienega and San Fernando Valley Relief Sewer." This sewer carries sewage from the San Fernando Valley to a spot near La Cienega Boulevard where it meets with the Hyperion disposal plant line. A small portion of this sewer line passes under a narrow strip of land known as the County Strip which is located outside the city limits but within an unincorporated area in the

county of Los Angeles. A portion of the proposed sewer route underlying public streets in the County Strip was occupied by the gas lines of the Southern California Gas Company, hereinafter called the company. The company agreed to relocate its gas lines in the County Strip to make way for the sewer mains subject to a later determination of its obligation to do so at its own expense. The company conceded its obligation to relocate its lines at its own expense within the city limits but denied that it had the same obligation with respect to its lines located in the County Strip. Judgment was rendered in favor of plaintiff company in the sum of $12,003.92, together with interest thereon at the rate of 7 per cent from March 25, 1955. The city appeals.

The city argues that a public utility, such as plaintiff, is obligated to relocate at its own expense its facilities underlying public streets within an unincorporated portion of the county to make way for a public improvement being installed therein by the city. The major points here involved are whether the installation and maintenance of sewers by a municipality for the protection of the public health is an exercise of the police power; whether the police power of the *state* is being exercised by a municipality when it constructs connecting sewers beyond its boundaries; and whether the relocation of gas lines, at the company's expense, constitutes a taking of private property without compensation within the meaning of the constitutional prohibitions.

There can be no doubt at this time but that the installation and maintenance of sewers in the interests of the public health by a municipality is an exercise of the police power. In *Harter* v. *Barkley*, 158 Cal. 742, 744, 745 [112 P. 556], it was held that "The regulation of the right of laying sewers in public streets is unquestionably a power conferred upon municipalities, partly by virtue of the provisions of section 11 of article XI of the constitution of California. The proper protection of the public health depends very largely upon the maintenance of a thorough and sanitary sewer system. . . . It has been held, and we think very properly, that ordinances of a municipal corporation providing for the construction, maintenance, and repairs of sewers and drains are to be sustained as a valid exercise of police power." "Regulation by ordinance of methods and devices for the conveyance of sewage from private dwellings in municipalities is recognized as an exercise of that branch of the police power which pertains to the public health. . . ." (*In re Nicholls,* 74 Cal.App. 504,

507 [241 P. 399] ; and see *Sullivan* v. *City of Los Angeles,* 116 Cal.App.2d 807, 811 [254 P.2d 590].)

The city contends that it is exercising the police power of the state when it constructs sewers beyond its boundaries and that it is authorized to do so by section 10101 of the Public Utilities Code and by its city charter.  Section 10101, Public Utilities Code, provides: ''There is granted to every municipal corporation of the State the right to construct, operate, and maintain water and gas pipes, mains and conduits, electric light and power lines, telephone and telegraph lines, sewers and sewer mains, all with the necessary appurtenances, across, along, in, under, over, or upon any road, street, alley, avenue, or highway, and across, under, or over any railway, canal, ditch, or flume which the route of such works intersects, crosses, or runs along, in such manner as to afford security for life and property.''

The Los Angeles City Charter provides (§ 2(6)) that the city shall be empowered ''To make and enforce within its limits all such local, police, sanitary, safety, welfare and other regulations as are not in conflict with general laws, and to exercise such jurisdiction *outside its limits* in such manner as may be authorized by law.''  (Emphasis added.)

In *Mulville* v. *City of San Diego,* 183 Cal. 734, 737 [192 P. 702], it was said: ''In general, a municipality is competent to act beyond its boundaries only in those cases in which it is so empowered by legislative authority and it is necessary, in passing upon the validity of acts of a municipality performed beyond its boundaries, to look to the general laws and municipal charter for the requisite authority.  In certain instances, owing to the urgency of extreme expediency or necessity, express authority is dispensed with and the power of the municipality to perform certain acts beyond its boundary is implied as incidental to the existence of other powers expressly granted.  Thus it has been held that, where a municipality has power to construct sewers, it may, as an implied incident to such power, extend the same beyond its boundaries when necessary or manifestly desirable.  (*McBean* v. *City of Fresno,* 112 Cal. 159 [53 Am.St.Rep. 191, 31 L.R.A. 794, 44 P. 358] ; *City of Coldwater* v. *Tucker,* 36 Mich. 474; *Cochran* v. *Village of Park Ridge,* 138 Ill. 295 [27 N.E. 939] ; 4 McQuillin on Municipal Corporations, sec. 1434.)'' (*Ebrite* v. *Crawford,* 215 Cal. 724, 728-729 [12 P.2d 937] ; *In re Blois,* 179 Cal. 291, 295 [176 P. 449] ; *Raynor* v. *City of Arcata,* 11 Cal.2d 113, 120 [77 P.2d 1054].)  In *In re Blois,*

179 Cal. 291, 296 [176 P. 449], we said that we were "disposed to agree" and "to concede that municipalities may exercise certain extraterritorial powers when the possession and exercise of such powers are essential to the proper conduct of the affairs of the municipality. As for example, this court has held that a municipality has power to construct and maintain a system of waterworks outside of its boundaries for the supply of its inhabitants with water, and that it might even go to the extent of supplying water to persons living without the limits of such municipality. (*South Pasadena* v. *Pasadena Land etc. Co.*, 152 Cal. 579 [93 P. 490].)"

It clearly appears that the city was exercising the police power of the state by express grant of power as set forth in section 10101 of the Public Utilities Code as augmented by the provisions of its own charter and, that even had there not been such an express grant of power, the authority would be implied from the nature of the work undertaken under the police power. There can be no question but that it was imperative that the city's sewage disposal system connect with the Hyperion disposal plant and that such an exercise of the police power would have carried with it, by necessary implication, the power to act without its boundaries in making the connection. As we said in *McBean* v. *City of Fresno*, 112 Cal. 159, 163 [44 P. 358, 53 Am.St.Rep. 191, 31 L.R.A. 794], where disposition of the outfall of the sewage system outside the city limits was involved, "Proper sewers are in this day so essential to the hygiene and sanitation of a municipality, that a court would not look to see whether a power to construct and maintain them had been granted by the charter, but rather only to see whether by possibility the power had been expressly denied."

The company contends that the city has neither a contractual right, nor the police power, to compel a utility to relocate its pipes without compensating the utility when both the pipes of the utility and the sewage system of the city are without the city limits. The company argues that its franchise from the county vested certain rights in it and contained only one limitation—that of bearing the expense of relocation of its lines if the county changed the grade of any highway. In other words, it is contended that its rights under the franchise from the county are by reason of the contract and are limited only by the terms of the contract. The city, on the other hand, maintains that the use by a public utility of public streets is subservient to the public use; that if the

company's argument had merit it would mean that a city, or county, could impair or surrender its fundamental police power by contract. The city relies upon the case of *New Orleans Gaslight Co.* v. *Drainage Com.*, 197 U.S. 453 [25 S.Ct. 471, 49 L.Ed. 831], in support of its position. The court there said: "It is the contention of the plaintiff in error that, having acquired the franchise and availed itself of the right to locate its pipes under the streets of the city, it has thereby acquired a property right which cannot be taken from it by a shifting of some of its mains and pipes from their location to accommodate the drainage system, without compensation for the cost of such changes. It is not contended that the gas company has acquired such a property right as will prevent the Drainage Commission, in the exercise of the police power granted to it by the State, from removing the pipes so as to make room for its work, but it is insisted that this can only be done upon terms of compensation for the cost of removal." The Supreme Court of the United States, speaking of the case of *New Orleans Gaslight Co.* v. *Louisiana Light etc. Co.*, 115 U.S. 650, 671 [6 S.Ct. 252, 29 L.Ed. 516], said: "Except that the privilege was conferred to use the streets in laying the pipes in some places thereunder, there was nothing in the terms of the grant to indicate the intention of the State to give up its control of the public streets, certainly not so far as such power might be required by proper regulations to control their use for legitimate purposes connected with the public health and safety." And, quoting from the same case, it was said: " 'The constitutional prohibition upon state laws impairing the obligation of contracts does not restrict the power of the State to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such contracts. Rights and privileges arising from contracts with a State are subject to regulations for the protection of the public health, the public morals, and the public safety, in the same sense, and to the same extent, as are all contracts and all property, whether owned by natural persons or corporations.' " The court further said: "The drainage of a city in the interest of the public health and welfare is one of the most important purposes for which the police power can be exercised. The Drainage Commission, in carrying out this important work, it has been held by the Supreme Court of the State, is engaged in the execution of the police power of the State." And "It is admitted that in the exercise of this power there has been

no more interference with the property of the gas company than has been necessary to the carrying out of the drainage plan. There is no showing that the value of the property of the gas company has been depreciated nor that it has suffered any deprivation further than the expense which was rendered necessary by the changing of the location of the pipes to accommodate the work of the Drainage Commission. The police power, insofar as its exercise is essential to the health of the community, it has been held cannot be contracted away. *New York & N. E. Railroad Co.* v. *Bristol,* 151 U.S. 556, 567 [14 S.Ct. 437, 48 L.Ed. 269] ; *Butchers' Union etc. Co.* v. *Crescent City etc. Co.,* 111 U.S. 746, 751 [4 S.Ct. 652, 28 L.Ed. 585] ; *Stone* v. *Mississippi,* 101 U.S. 814, 816 [25 L.Ed. 1079]. In a large city like New Orleans, situated as it is, and the entrepôt of an extensive commerce coming from many foreign countries, it is of the highest importance that the public health shall be safeguarded by all proper means. It would be unreasonable to suppose that in the grant to the gas company of the right to use the streets in the laying of its pipes it was ever intended to surrender or impair the public right to discharge the duty of conserving the public health. The gas company did not acquire any specific location in the streets; it was content with the general right to use them, and when it located its pipes it was at the risk that they might be, at some future time, disturbed, when the State might require for a necessary public use that changes in location be made. . . .

"The need of occupation of the soil beneath the streets in cities is constantly increasing, for the supply of water and light and the construction of systems of sewerage and drainage, and every reason of public policy requires that grants of rights in such sub-surface shall be held subject to such reasonable regulation as the public health and safety may require. There is nothing in the grant to the gas company, *even if it could legally be done,* undertaking to limit the right of the State to establish a system of drainage in the streets. We think whatever right the gas company acquired was subject insofar as the location of its pipes was concerned, to such future regulations as might be required in the interest of the public health and welfare. These views are amply sustained by the authorities." (Emphasis added.) Speaking of *Chicago, Burlington etc. R. R. Co.* v. *Chicago,* 166 U.S. 226, 254 [17 S.Ct. 581, 41 L.Ed. 979], the court said: "In the latter case it was held that uncompensated obedience to a regulation

enacted for the public safety under the police power of the State was not taking property without due compensation. In our view, that is all there is to this case. The gas company, by its grant from the city, acquired no exclusive right to the location of its pipes in the streets, as chosen by it, under a general grant of authority to use the streets. The city made no contract that the gas company should not be disturbed in the location chosen. In the exercise of the police power of the State, for a purpose highly necessary in the promotion of the public health, it has become necessary to change the location of the pipes of the gas company so as to accommodate them to the new public work. In complying with this requirement at its own expense none of the property of the gas company has been taken, and the injury sustained is *damnum absque injuria.*"

Company argues that its franchise gave it vested rights which cannot be taken away without payment of compensation. In *Russell* v. *Sebastian*, 233 U.S. 195, 204 [34 S.Ct. 517, 58 L.Ed. 912, L.R.A. 1918E 882], relied upon by company in support of its contention, a gas company operating under a provision of the Constitution of California sought to lay additional pipes in streets not theretofore used by it. The city of Los Angeles, by ordinance, prohibited, in effect, the use by the company of the streets not theretofore used by it. The Supreme Court held that the grant to the gas company which resulted from an acceptance of the state's offer constituted a contract and vested in the company a property right "protected by the Federal Constitution [is], not open to dispute in view of the repeated decisions of this court." The effect of the municipal ordinance in the Russell case was to *take away* from the gas company its right to extend its mains and lines into additional streets in order to provide additional service to the people. No such rights are involved in the case at bar. We are here concerned merely with a relocation of existing lines in order to make way for a sewage system being constructed for the benefit of the public. The company's vested property right here is to continue its lines and installations at *some,* rather than a specific, *location* within the public streets. By such a relocation, property "is not, within the meaning of the Constitution, taken for public use, nor is the owner deprived of it without due process of law." (*Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U.S. 226 [17 S.Ct. 581, 41 L.Ed. 979].) In *Chicago B. & Q. Ry. Co.* v. *Illinois,* 200 U.S. 561, 605 [26 S.Ct. 341, 50 L.Ed. 596], the court said that it had "recognized

the principle that injury may often come to private property as the result of legitimate governmental action, reasonably taken for the public good and for no other purpose, and yet there will be no *taking* of such property within the meaning of the constitutional guaranty against the deprivation of property without due process of law, or against the taking of private property for public use without compensation. To this class belongs the recent, and as we think, decisive case of *New Orleans Gaslight Co.* v. *Drainage Commission. . . .*'' And, at pages 609, 610, ''Upon the general subject there is no real conflict among the adjudged cases. Whatever conflict there is arises upon the question whether there has been or will be in the particular case, within the true meaning of the Constitution, a 'taking' of private property for public use. If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution.''

The company in support of its argument that its vested rights cannot be impaired without compensation also cites the case of *City of Los Angeles* v. *Los Angeles Gas & Elec. Corp.*, 251 U.S. 32, 39 [40 S.Ct. 76, 64 L.Ed. 121], that ''A franchise conveys rights, and if their exercise could be prevented or destroyed by a simple declaration of a municipal council, they would be infirm indeed in tenure and substance. It is to be remembered that they came into existence by compact, having, therefore, its sanction, urged by reciprocal benefits, and are attended and can only be exercised by expenditure of money, making them a matter of investments and property, and entitled as such against being taken without the proper process of law,—the payment of compensation.'' In the Los Angeles case, *supra,* a clear distinction exists which was specifically noted by the court: ''what the city did was done not in its governmental capacity—an exercise of the police power—but in its 'proprietary or quasi-private capacity' and that therefore the city was subordinate in right to the corporation, the latter being an earlier and lawful occupant of the field. The difference in the capacities is recognized and the difference in attendant powers pointed out in decisions of this court. *Vilas* v. *Manila,* 220 U.S. 345 [31 S.Ct. 416, 55 L.Ed. 491]; *Russell* v. *Sebastian,* 233 U.S. 195 [34 S.Ct. 517, 58 L.Ed. 912, L.R.A. 1918E 882]; *South Carolina* v. *United States,* 199 U.S. 437 [26 S.Ct. 110, 50 L.Ed. 261]; *New*

*Orleans Gaslight Co.* v. *Drainage Commission,* 197 U.S. 453 [25 S.Ct. 471, 49 L.Ed. 831] ; *Vicksburg* v. *Vicksburg Waterworks Co.,* 206 U.S. 496, 508 [27 S.Ct. 762, 51 L.Ed. 1155]." (251 U.S. at pp. 38, 39.)   The city in the instant case was acting in its governmental capacity—in the exercise of police powers granted to it by the state—and in the interests of the public health and welfare.   The city, in the Los Angeles case, *supra,* sought to establish a lighting system of its own.   It was noted that the only question was "whether a city may as a matter of public right and without compensation clear a 'space' for the instrumentalities of its system by removing or relocating the instrumentalities of other systems."   (251 U.S. at p. 37.)   It was specifically held: "It will be observed that we are not concerned with the duty of the corporation operating a public utility to yield uncompensated obedience to a police measure adopted for the protection of the public, but with a proposed uncompensated taking or disturbance of what belongs to one lighting system in order to make way for another.   And this the Fourteenth Amendment forbids.   What the grant was at its inception it remained and was not subject to be displaced by some other system, even that of the city, without compensation to the corporation for the rights appropriated."   (251 U.S. at p. 40.)

Company next argues that the state cannot impair the obligation of its contracts without compensation.   From this argument company reasons that because its franchise contained only one condition—the relocation of its installations at its own expense in the event of changes in the highway grade—no other conditions may be imposed.   It will be recalled that this point was specifically considered in the case of *New Orleans Gaslight Co.* v. *Drainage Commission,* 197 U.S. 453 [25 S.Ct. 471, 49 L.Ed. 831], where it was held that "The police power, insofar as its exercise is essential to the health of the community, it has been held cannot be contracted away" and that "There is nothing in the grant to the gas company, *even if it could legally be done,* undertaking to limit the right of the State to establish a system of drainage in the streets.   We think whatever right the gas company acquired was subject insofar as the location of its pipes was concerned, to such future regulations as might be required in the interest of the public health and welfare."   Company contends that the rules set forth in the New Orleans Gaslight case have been "disposed of very tersely" by the case of *Panhandle E. Pipeline*

*Co.* v. *State Highway Com.*, 294 U.S. 613 [55 S.Ct. 563, 79 L.Ed. 1090]. The Panhandle case involved a Delaware corporation which had obtained, by purchase, rights of ways from owners of property to construct and maintain conduits for transporting natural gas. In 1930 it purchased rights of way for pipes, auxiliary telephone lines, etc. After the pipes were in operation, the Highway Commission of Kansas, in 1933, pursuant to statute adopted plans for new highways across the company's rights of way in several places. The state obtained permission from the owners of the fee to use the land obtained for the highways, but the company refused to permit the use of its right of way. The state court had held that the new highways were being constructed under the police power of the state and that the necessary relocation of the company's installations at company expense did not constitute a taking of private property without due process of law. The Supreme Court of the United States reversed the state court holding (p. 619) that "A claim that action is being taken under the police power of the state cannot justify disregard of constitutional inhibitions." It can readily be seen that there are important distinctions between the Panhandle case and the New Orleans Gaslight case and the case at bar. In the Panhandle case the company had purchased rights of way from private owners of land for its installations. In the New Orleans Gaslight case and the case at bar, the companies were granted permission to use the subsurface of public roads already in existence. In the Panhandle case, the state desired to construct new highways over the private rights of way previously acquired by the company. The acquisition of and construction of public highways does not come within the purview of the police power but is accomplished under the power of eminent domain embraced within section 14 of article I of the Constitution of the State of California. (See *Rose* v. *State,* 19 Cal.2d 713 [123 P.2d 505] ; *Beals* v. *City of Los Angeles,* 23 Cal.2d 381 [144 P.2d 839] ; *Bacich* v. *Board of Control,* 23 Cal.2d 343 [144 P.2d 818] ; *People* v. *Ricciardi,* 23 Cal.2d 390 [144 P.2d 799].) The Supreme Court of the United States did not overrule, either directly or indirectly, the New Orleans Gaslight case, but distinguished it as being within the purview of the exercise of the police power as follows: "*New Orleans Gaslight Co.* v. *Drainage Commission,* 197 U.S. 453 [49 L.Ed. 831, 25 S.Ct. 471], and similar cases concerning pipes in public streets are not controlling. In them the pipes were laid upon agreement,

actual or implied, that the owner would make reasonable changes when directed by the municipality." (P. 623.)

It was specifically pointed out in the New Orleans Gaslight case that the police power of the sovereignty could not be contracted away and that any franchise, such as we have under consideration here, must be considered, insofar as location of gas installations is concerned, to have been acquired subject to such future regulations as might be required in the interest of the public health and welfare. As the Supreme Court said in *Chicago, Burlington etc. R. R. Co.* v. *Chicago*, 166 U.S. 226, 254 [17 S.Ct. 581, 41 L.Ed. 979], "uncompensated obedience to a regulation enacted for the public safety under the police power of the state was not taking property without due compensation." This holding was again stated and approved in *New Orleans Public Service* v. *New Orleans*, 281 U.S. 682, 687 [50 S.Ct. 449, 74 L.Ed. 1115].

Both the city and company rely upon *Merced Falls Gas etc. Co.* v. *Turner*, 2 Cal.App. 720, 721, 723, 724 [84 P. 239], in support of their positions. The Merced case involved the relocation of some electric light poles on a city street. The company brought an action to enjoin the city and, after declining to amend its complaint, judgment was entered upon defendant city's demurrers. The court noted that "The sole contention of appellant [company] in both appeals involves the power of the city authorities to compel or make the change in question." The court, in holding that the city had the power to compel the relocation of the poles, said: "But the constitution, in providing for the exercise and enjoyment of the franchise owned by appellant [company], did not grant an absolute, indefeasible right or easement in the particular spots of earth where its poles were planted originally, nor does the grant contain a hint that the superintendent of streets, or other officer in control thereof, exhausted his jurisdiction or power to direct or control the use of the streets by appellant, when the poles were located in the first instance . . . and therefore such regulations, or the absence of them, cannot limit or annul the general power granted to the municipality, to direct and control the manner in which the streets shall be used, and the franchise exercised. Courts will not hesitate to stay the arm of municipal power when any attempt to curtail or deny the constitutional right is made manifest or a clear abuse of discretion is shown. But they will as unhesitatingly frown upon the doctrine that the constitutional

provision in question must be construed as an abdication or denial of power on the part of cities to widen, straighten, beautify and improve streets and sidewalks, and to compel property owners of every class and kind to conform to all reasonable regulations redounding to the general good.'' Company relies on the following language from the same case: ''It may be contended that the averment of irreparable injury sufficiently shows that the regulation is unreasonable and confiscatory. The damage which has already accrued is estimated at $1,000, and it is difficult to guess why the sum total of damage resulting from the removal of all the poles may not be as easily estimated and compensated.'' From this company argues that the holding of the case is that the company there was entitled to damages accruing by reason of the relocation of its poles. The case cannot be construed as contended for by company since the question of the cost of relocating the poles was not involved. The only contention made there was that the city did not have the power to compel the company to relocate its poles and any statement which did not bear upon that question is clearly dictum. Company cites many other cases in support of its position, none of which is in point. *Stockton Gas etc. Co. v. San Joaquin County,* 148 Cal. 313 [83 P. 54, 7 Ann. Cas. 511, 5 L.R.A.N.S. 174], held that the situs where a franchise was used was where it was to be taxed; *Matter of Russell,* 163 Cal. 668 [126 P. 875, Ann. Cas. 1914A 152], held that a gas company had no vested rights in streets not previously used by it for the laying of gas mains; *Western Union Tel. Co. v. Hopkins,* 160 Cal. 106 [116 P. 557], was concerned with the situs of a franchise as taxable property; *South Pasadena v. Pasadena Land etc. Co.,* 152 Cal. 579 [93 P. 490], involved the sale and transfer of a franchise for the supplying of water by a private corporation to a municipal corporation; *County of Los Angeles v. Southern Cal. Tel. Co.,* 32 Cal.2d 378 [196 P.2d 773], involved an attempt by the county to collect a tax from the defendant which had obtained a franchise from the state under section 536 of the Civil Code. In *Matter of Keppelmann,* 166 Cal. 770 [138 P. 346], a municipal ordinance provided that written permission had to be obtained from the board of public works before excavations could be made in streets occupied by a gas company for its pipes and conduits. This court held that the company's rights under the constitutional grant were ''not absolute'' but subject to the direction of those in control of such streets. *Rose v. State,* 19 Cal.2d 713,

730 [123 P.2d 505], involved inverse condemnation proceedings; *Archer* v. *City of Los Angeles,* 19 Cal.2d 19 [119 P.2d 1], was erroneously decided under the police power doctrine but in reality involved only inverse condemnation under article I, section 14, of the California Constitution. *House* v. *Los Angeles County Flood Control Dist.,* 25 Cal.2d 384 [153 P.2d 950], involved an action in inverse condemnation for damages sustained by plaintiff because of the negligence of the defendant in the planning and construction of certain flood control channel work in the Los Angeles River. This case in effect overruled the Archer case, *supra. Hossom* v. *City of Long Beach,* 83 Cal.App.2d 745 [189 P.2d 787], involved an action to redeem land which had been sold for delinquent taxes. *City of Los Angeles* v. *Klinker,* 219 Cal. 198 [25 P.2d 826, 90 A.L.R. 148], involved the condemnation of land for public uses and held that the buildings and other fixtures on the land must be considered in determining the owner's compensation. In *Sacramento etc. Dist.* v. *Pacific G. & E. Co.,* 72 Cal.App.2d 638 [165 P.2d 741], a special proceeding in eminent domain under the Public Utilities Act.

Company's arguments concerning *statutory* authority for payment of compensation for utility relocations are of no avail here and it is only necessary to point out that no such statutory authority exists to cover the situation with which we are here concerned.

For the foregoing reasons I am compelled to join with the majority and vote for a reversal of the judgment with directions to the trial court to enter judgment for the defendant city.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons stated by the District Court of Appeal in *Southern California Gas Co.* v. *City of Los Angeles,* (Cal.App.) 318 P.2d 735.

Schauer, J., concurred.

Respondent's petition for a rehearing was denied September 24, 1958. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.