[Civ. No. 11269. Third Dist. Dec. 16, 1966.]

NORTHEAST SACRAMENTO COUNTY SANITATION DISTRICT, Plaintiff and Appellant, v. NORTHRIDGE PARK COUNTY WATER DISTRICT OF SACRAMENTO COUNTY, Defendant and Respondent.

John B. Heinrich, County Counsel, and Lawrence E. Viau, Jr., Deputy County Counsel, for Plaintiff and Appellant.

Lambert, Lemmon & Winchell and John V. Lemmon for Defendant and Respondent.

PIERCE, P. J.— ■ The sole question on this appeal is whether a county sanitation district must compensate a county water district for the latter's costs when required to relocate its water mains because of an extension of the sanitation district's sewer facilities (both works being located beneath county roads). The trial court held that it must. We agree with that holding upon the principles of law and reasoning related below.

Northridge is a county water district created under the provisions of section 30000 et seq. of the Water Code. Its function is to provide water for domestic purposes to people within its boundaries located within a part of Sacramento County. It owns and operates a water distribution system at least a part of which consists of water lines located beneath the surface of county roads. County water districts come into existence by an election of the voters within the boundaries of the proposed district. (Wat. Code, § 30295.) They are managed by a board of directors also elected by the voters within the district. (Wat. Code, § 30732 et seq.)

Appellant Northeast is a county sanitation district organized under the provisions of section 4700 et seq. of the Health and Safety Code. It operates and maintains sewers in a portion of Sacramento County. Its boundaries are not coterminus with the boundaries of the water district. It also comes into existence by an election at which "only voters registered *in the proposed*

*district* may vote.'' (§ 4716.) (Italics supplied.)[1] Sanitation districts are also managed by a board of directors selected in various ways. This particular district, because it is carved wholly out of unincorporated territory, has as its board of directors the county supervisors; but they are not supervisors *qua* supervisors; they are a board of directors.[2]

Both districts have statutory rights to build and maintain their facilities in and beneath public roads (sanitation districts, Health & Saf. Code, §§ 4759 and 4759.1; water districts, Wat. Code, §§ 31060-31062.)

Both districts derive their revenues for the construction and maintenance of their works and for the services they afford by assessments and taxes levied upon the people within their districts. (See, e.g., re sanitation districts, Health & Saf. Code, § 4747, 4780 et seq.; re water districts, Wat. Code, § 35900 et seq., § 36725 et seq.)

In 1963 Northeast constructed sewers in and under the same county roads where lay the water mains of Northridge already constructed. This required a relocation of the latter. A dispute arose as to Northeast's obligation to pay for the relocation. By agreement Northridge moved its mains and Northeast paid the cost of such relocation without prejudice to a suit for reimbursement. This suit was brought to resolve the question.

Northeast argues that a county could compel a water district to relocate its lines without remibursement of costs whenever the county chose to install works of its own and therefore it has the same superior status over Northridge because it is managed by the board of supervisors. We may assume (but we by no means concede) the premise. The conclusion drawn is a *non sequitur*. Sacramento County's Board of Supervisors (in this particular sanitation district) happens to act ex officio as the board of directors. When they do so they do not act as the governing body of the county or for the county. When representing Northeast they are as much an independent board of directors as is the board of directors of Northridge. That

---

[1]The county board of supervisors initiates the proceedings to form the district. A hearing, however, must be held and whenever 2 percent of the registered voters object to the formation of the district it must either be abandoned or an election called as stated. (Health & Saf. Code, § 4715.)

[2]Sometimes the board will be a mixture of elected private individuals, a member, or members, of the governing body of cities, counties or other public agencies, lying wholly or partly within its boundaries. (Health & Saf. Code, §§ 4730, 4730.1.)

portion of the public residing within Northridge does not as a whole either benefit by or bear the burden of taxation for the works of the sanitation district.

In *County of Contra Costa* v. *Central Contra Costa Sanitary Dist.* (1960) 182 Cal.App.2d 176 [5 Cal.Rptr. 783] (hearing by Supreme Court denied), a county acting solely on behalf of a flood control district, performed the work of relocating the sewer line of a sanitary district[3] already in existence extending over and across a thoroughfare, to wit: a county bridge. The relocation was made necessary by the flood control district's project to deepen a creek channel. The county sought compensation from the sanitary district for the cost of such relocation. The county's right of recovery was denied in both the trial and appellate courts. One of the contentions of the county was that the right of way of the sanitary district was but a franchise which it identified with the franchise of a privately-owned public utility. The court's opinion (per Presiding Justice Bray) states (on p. 179): ". . . Obviously a sanitary district bears no resemblance to a privately owned public utility. It is a public corporation organized under the provisions of the Sanitary District Act of 1923 (Health &'Saf. Code, § 6400 et seq.). Moreover, the sanitary district's right to a sewer line in the street is due, first, to the fact that it was there when the county acquired the street, and secondly, to the rights given by section 6518, Health and Safety Code. A privately owned public utility, on the other hand, derives its right to streets under franchises which require it to move its facilities whenever required by the authorities at its own expense.

"As said by the Honorable Wakefield Taylor in his memorandum of decision, the sanitary district's right to maintain its sewer line 'is a species of real property and neither the Flood Control District nor the County Board of Supervisors acting on behalf of said District and for its purposes has any right to appropriate or interfere with property already dedicated to a public use, without legal process and the payment of just compensation. The cost of relocation should not be borne by the taxpayers of the County generally nor by the taxpayers

[3]In the interests of exactitude a sanitary district is not the same as a sanitation district. The former is formed under Health and Safety Code section 6400 et seq., the latter, as stated, under section 4700 of said code. Both are authorized to *construct sewers; so also, by the way, is a water* district (Wat. Code, § 35500 et seq.).

of the Sanitary District, but rather by the people resident within the Flood Control zone benefited by the improvement.' '' (With reference to the quoted statement see Van Alstyne, *Governmental Tort Liability: A Public Policy Prospectus*, 10 U.C.L.A. L.Rev. 463, 501-502.)

The *Contra Costa Sanitary Dist.* case, *supra*, involved the relocation of sewer lines to accommodate the construction of flood control drainage works. The case at bench involves the relocation of water mains. The trial court could find no priority between the functions performed by Northeast and those performed by Northridge. Neither can we. One provides for water brought in and used for domestic purposes; the other takes care of the disposition of that water (plus human and other wastes) after it is used. As we see it, one is no more or less important in our society than the other. Both agencies serve their separate users in the interests of the public health and safety. It is important that the water supply be reasonably pure (e.g., lest a typhoid epidemic result). It is equally, but no more important, that sewerage be properly disposed of for similar public health reasons.

A water district is also empowered to provide sewer lines (see footnote 3). It would indeed seem an absurdity to hold that the water lines of such a district which bring the water to the home have a lesser status than the lines which take the water away after domestic use.

Each district here involved comprises a separate group of people who will benefit and should be burdened only by the building and maintenance of its own public works. Why should the taxpayers of Northridge be taxed to pay the costs of a sewerage disposal system which does not benefit them? Why should the taxpayers of Northeast receive a free ride for this not inconsiderable item of expense in the building of said sewerage system?

The obvious inequities of the postulated result become magnified when one remembers that the water lines of Northridge were in place first and had to be relocated to make way for new lines being installed by Northeast, a district which performs functions not perceptibly different from the functions of Northridge—certainly as regards the running of its lines beneath the surface of the street. Under such circumstances the district whose facilities are first in place should have the right to be compensated when it is determined it has to relocate its lines.

The court in the *Contra Costa Sanitary District* case, *supra,* so held and we agree with that holding. As stated above, no statute gives a sanitation district superior rights over a water district in the matter of relocation. In the matter of condemnation for a higher public use California's statute, Code of Civil Procedure, section 1241, subdivision 2, referring to resolutions of necessity, treats sanitary, sanitation and water districts exactly the same. (In the matter of denying—under certain conditions—the right of condemnation for a higher public use, subdivision 3 of the same statute refers specifically to water districts, only generally to other ''public utility districts.'') Our Supreme Court in the very recent case of *City of Beaumont* v. *Beaumont Irrigation Dist.,* 63 Cal.2d 291 [46 Cal.Rptr. 465, 405 P.2d 377] (Sept. 1965) held that under the latter statute the irrigation district's domestic water system could not be condemned by a city.

In addition to its favorable position in the area of eminent domain, a water district has been expressly given special powers. Water Code section 31062 provides in part: ''[A] district has the same rights and privileges appertaining to the rights of way as are granted to municipalities within the State.'' One of those privileges is, in an appropriate situation, to ''exercise police powers equal in extent to those of the state.'' (*McKay Jewelers, Inc.* v. *Bowron,* 19 Cal.2d 595, 600 [122 P.2d 543, 139 A.L.R. 1188].)

These matters we point out to illustrate that so far at least as the Legislature is concerned water districts, in the hierarchy of governmental agencies, do not occupy a position inferior to counties, cities and other public entities.

As noted, *County of Contra Costa* v. *Central Contra Costa Sanitary Dist., supra,* 182 Cal.App.2d 176, discussed (and distinguished) the rules applicable to the nature of a franchise of a privately-owned public utility in a public street as compared to the franchise of a public agency. A franchise, whether it be owned by a private utility or a public agency, is property. A franchise to lay pipes or conduits in a street is real property in the nature of an easement. (*Stockton Gas etc. Co.* v. *San Joaquin County,* 148 Cal. 313, 321 [83 P. 54, 7 Ann. Cas. 511, 5 L.R.A. N.S. 174]; *Balestra* v. *Button,* 54 Cal.App.2d 192 [128 P.2d 816].) In *Southern Cal. Gas Co.* v. *City of Los Angeles,* 50 Cal.2d 713, 716 [329 P.2d 289], our Supreme Court, while recognizing the private utility's franchise in a public street is property created by contract and that its

rights cannot be taken or damaged without payment of just compensation (Cal. Const., art. I, § 14; U.S. Const., Amend. XIV, § 1), nevertheless held (on p. 716) that the utility accepts its franchise rights in a public street "subject to an implied obligation to relocate its facilities therein at its own expense when necessary to make way *for a proper governmental use of the streets.*" (Italics supplied.) The phrase (emphasized by us) does not limit the precedential governmental uses to rights to repair, maintain and reconstruct the street involved. In *Southern Cal. Gas Co., supra,* the city was causing a gas line relocation to enable it to put in a sewer line.

As we see it, there is no inequity in the rule asserted. It is a consideration the privately-owned utility pays for the right, usually a monopoly, to furnish its designated services to a section of the public for which the latter pays at rates which, though regulated, are designed to afford the utility's shareholder's private profit after deducting all expense outlays (including the costs of relocation under discussion.)

It would be a mistake to identify the rights of a public entity to lay its facilities in a public street with the rights of a private utility, although both rights are sometimes called franchises. *Contra Costa Sanitary Dist., supra,* points out this fallacy. It has been held, however, in at least two cases that even the right, easement or franchise of a public utility, may under some circumstances be required to assume the burden of the costs of relocating its lines. When that occurs it must be justified under a proper exercise of the police power. In *State of California* v. *Marin Municipal Water Dist.,* 17 Cal.2d 699 [111 P.2d 641], it was held that the state could do this when relocation of the municipal water district's lines was made necessary to reconstruct a state highway. There, however, an express statute, section 680 of the Streets and Highways Code, had given the Department of Public Works the authority to require removal of a pipeline at the owner's expense when necessary "to insure the safety of the traveling public." It was held (on p. 706) that the Legislature's action was "clearly within that residuary power of the state to protect the health, safety, and morals of its inhabitants known as the 'police power.' " The court added that determination of whether a statute constitutes a taking of property without due process of law or an impairment of the obligation of a contract on the one hand or on the other hand a proper exercise of the

police power is a balancing process. The court stated: "If the benefit to the public [as a whole] outweighs the burden on the individual, the statute is a valid exercise of the 'police power.' " (P. 706) The court (also on p. 706) stressed: "The trial court found in the present case that the removal and relocation of defendant's main was necessary to insure the safety of the traveling public and to permit the construction of the highway. . . . The benefit to the public as a whole thus clearly outweighs the burden imposed upon defendant, and the legislation is therefore valid."

*East Bay Municipal Utility Dist.* v. *County of Contra Costa,* 200 Cal.App.2d 477 [19 Cal.Rptr. 506] (hearing by Supreme Court denied), is the second case referred to wherein one public agency, a municipal water district, was held obligated to pay the costs of relocating its facilities (water mains) underneath an existing county road to accommodate the reconstruction of that road by the county. Since a county and not the state was involved Streets and Highways Code section 680 was inapplicable. The court held, nevertheless, that the obligation to relocate at the public agency's cost would be implied. There is language in the decision which equates a privately owned utility with a public agency and a statement that "the controlling factor . . . is the all-important distinction between a governmental and merely proprietary use of the street." (P. 481.) We can only accept that statement with reservation. Since the holding was that the right of the traveling public— the public as a whole—has a paramount right in an existing street, its maintenance, repair and reconstruction, superior to that of another public agency to lay its facilities in and under that street, the rule is established law by Supreme Court decision and must be accepted, but that case is distinguishable from the case at bench. In the stated sense "governmental use" means the right of government, whether it be the state, county, city or any other public entity (including a water district to which the police power also has been conferred) to exercise that power in a proper situation. But in the sense that the right exists in favor of one public agency and against another without any of the weighing and balancing upon which the validity of an attempted exercise of the police power hinges and solely because of some unexplained and inexplicable "governmental versus proprietary" distinction—that is a proposition which we do not accept as a true measure of the respective rights of public entities in the field of relocation

cost allocation. Although the Supreme Court in *Southern Cal. Gas Co., supra,* 50 Cal.2d 713, 718, did refer to a municipal water district as operating in a proprietary capacity, that statement must be read in the context described above.

It is noteworthy that in *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211, 216 [11 Cal.Rptr. 89, 359 P.2d 457], the Supreme Court's opinion remarks that the ''governmental versus proprietary'' distinction operated both ''illogically'' and ''inequitably'' as applied to the law of governmental immunity from liability in torts. It was in that field that the distinction had been born (see Prosser, Law of Torts (3d ed.) p. 1005). Regarding the application of the doctrine Dean Prosser states: '' '[R]ules which courts have sought to establish in solving this problem are as logical as those governing French irregular verbs.' ''[4] Under the Government Tort Liability Act of 1963 (Gov. Code, § 900 et seq.) the distinction has been abandoned in the field of government immunity from torts.

To maintain the ''Governmental versus proprietary function'' as a test in the determination of relocation cost allocation is no less specious. In *Nissen* v. *Cordua Irrigation Dist.,* 204 Cal. 542 [269 P. 171], an irrigation district furnishing water for irrigation of lands was held to be performing a governmental function, yet as we have seen a district furnishing a domestic water supply is said to be performing a proprietary act. Fire departments which have been uniformly held to be governmental (see Van Alstyne, *op cit.,* p. 18) would be useless without water and water mains. We agree with the court in *Washington Township* v. *Ridgewood Village* 26 N.J. 578 [141 A.2d 308, 311] : ''[W]hatever local government is authorized to do constitutes a function of government, and when a municipality acts pursuant to granted authority it acts as government and not as a private entrepreneur.''

As between two public agencies located as these two are located, each district when performing the identical type of

---

[4]As stated by Professor Van Alstyne, California Government Tort Liability (Cont. Ed. Bar), pages 18-19, section 1.17: ''Inadequacies of Governmental-Proprietary Distinction . . . Manifestly, the distinction was unsatisfactory. It offered no solid grounds for prediction, invited test litigation, operated in a fortuitous and erratic fashion, and had little relevance to either the social need for risk distribution or the economic feasibility of shifting from the injured individual to the public treasury losses due to serious injuries.''

function—the laying of pipe lines in a public street—should pay its own way. That is both equitable and sound law.

The judgment is affirmed.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied January 10, 1967, and appellant's petition for a hearing by the Supreme Court was denied February 8, 1967.