[No. A070278. First Dist., Div. Three. Jan. 3, 1997.]

CITY OF LIVERMORE, Plaintiff and Respondent, v.
PACIFIC GAS AND ELECTRIC COMPANY, Defendant and Appellant.

**COUNSEL**

Bruce R. Worthington, J. Michael Reidenbach, Richard L. Meiss and David J. Williamson for Defendant and Appellant.

Thomas R. Curry, City Attorney, Charles J. Williams and Teresa L. Highsmith for Plaintiff and Respondent.

Kane, Ballmer & Berkman, R. Bruce Tepper, Jr., Joseph W. Pannone, Michael J. Karger and Marc J. Manason as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

CORRIGAN, J.— ■ When a municipal street-widening project is financed partly by assessment district funds and partly by fees imposed on development throughout the city, who must pay the cost of relocating utility poles to accommodate the new lanes of traffic? We conclude the utility company must pay.

### Background

The facts relevant to this appeal are undisputed. Pacific Gas and Electric Company (PG&E) operates its equipment in the streets of Livermore under a franchise granted by the city under the Franchise Act of 1937 (Pub. Util. Code, §§ 6201-6302).[1] The circulation element of Livermore's general plan, dated April 1989, projected that First Street would require widening from two to six lanes between Interstate 580 and Portola Avenue by the year 2010. In October 1989, Livermore approved a shopping center development at First Street and Las Positas Road, which is in the segment of First Street slated for widening. Livermore later approved a residential subdivision and another shopping center in the same area. As a condition of approval, Livermore required all three developers (collectively, the First Street Developers) to widen First Street along their frontages from two to six lanes. This action necessitated relocation of PG&E's utility poles.

The First Street Developers approached the city in 1990 and requested the formation of an assessment district to fund the street-widening project and related improvements to the First Street interchange with Interstate 580. Livermore consented and established a district, collecting some assessments in cash and issuing bonds to fund the unpaid balance. Livermore agreed to pay some costs of the project with funds generated by traffic impact fees (TIF). These fees were paid by the recipients of building permits or other entitlements for development throughout the city and were based on the extent to which the proposed development would increase traffic.

Livermore retained one engineering firm to design the project and another to spread the costs of the project's various elements to the different entities involved. The "spread engineer" allocated the cost of constructing the

---

[1] All further statutory references are to the Public Utilities Code.

outside lanes of First Street to the assessment district and the cost of the four inside lanes and median to Livermore's TIF fund. The cost of relocating PG&E's 21-kv line, which provided local service and was to be placed underground, was allocated to the assessment district. The cost of relocating the 60-kv line, which was not to be placed underground, was allocated to PG&E.

PG&E refused to pay, insisting the assessment district should pay for relocating both power lines, because the First Street Developers had created the need for widening the street. In order to go forward with the project, Livermore agreed to advance PG&E $86,294.37 for pole relocation, reserving the right to recover the payment through negotiation or litigation. At about the same time, the city put the project out to bid. PG&E's contribution was deleted from the spread engineer's report, and the contingent liability of the assessment district was increased to cover the cost of relocating the poles should PG&E ultimately succeed in resisting payment. Livermore advanced the $86,294.37 to PG&E from the cash assessments. PG&E relocated the poles, and Livermore filed suit to recover the relocation cost. After a court trial, Livermore recovered judgment for $87,157.37.[2]

*Discussion*

At common law, when a public utility accepts franchise rights in public streets it assumes an implied obligation to pay for relocation of its facilities when necessary to make way for a proper governmental use. This obligation arises from the paramount right of the people as a whole to use public thoroughfares. (*Southern Cal. Gas Co.* v. *City of L. A.* (1958) 50 Cal.2d 713, 716-717 [329 P.2d 289]; *L.A. County Flood Control Dist.* v. *Southern Cal. Edison Co.* (1958) 51 Cal.2d 331, 334, 335 [333 P.2d 1]; *Pacific Gas & Electric Co.* v. *City of San Jose* (1985) 172 Cal.App.3d 598, 601, 602 [218 Cal.Rptr. 400].) The common law rule is codified in section 6297, which governs PG&E's franchise in Livermore: "The grantee shall remove or relocate without expense to the municipality any facilities installed, used, and maintained under the franchise if and when made necessary by any lawful change of grade, alignment, or width of any public street . . . by the municipality."

■ Section 6297 differs from the common law rule by providing for relocation "without expense to the municipality," instead of at the utility's own expense. However, our Supreme Court has held that section 6297 does

---

[2]Livermore slightly increased its demand at trial, evidently to account for a service charge imposed by PG&E. According to Livermore, the final cost to the assessment district for placing the 21-kv line underground was $659,705.25.

not alter the implied common law obligations that are assumed by a utility. when it accepts a franchise. (*L.A. County Flood Control Dist.* v. *Southern Cal. Edison Co., supra,* 51 Cal.2d at p. 338.) The Legislature may grant a utility the right to compensation for relocating its facilities, but that right will not be inferred from the terms of section 6297. The grant must be specifically articulated by the Legislature. (*Southern Cal. Gas Co.* v. *City of L. A., supra,* 50 Cal.2d at p. 719; *L.A. County Flood Control Dist., supra,* at pp. 338-339; see also *Pacific Tel. & Tel. Co.* v. *Redevelopment Agency* (1978) 87 Cal.App.3d 296, 299-301 [151 Cal.Rptr. 68]; *Pacific Tel. & Tel. Co.* v. *Redevelopment Agency* (1977) 75 Cal.App.3d 957, 964, 965, fn. 4 [142 Cal.Rptr. 584].)

■ PG&E contends it is entitled to judgment in its favor under *Pacific Gas & Electric Co.* v. *Damé Construction Co.* (1987) 191 Cal.App.3d 233 [236 Cal.Rptr. 351] (*Damé*). In *Damé,* Contra Costa County approved a residential subdivision on the condition that the developer widen part of an adjacent road. The county requested that PG&E make arrangements for the relocation of its adjoining power poles. PG&E told the developer it would only move the poles at the developer's expense. The developer refused to pay and widened the road without moving the poles, leaving them in the middle of the new pavement. PG&E moved the poles at its own expense and successfully sued the developer for reimbursement. (*Id.* at p. 235.)

The *Damé* court began its analysis by noting that the common law rule codified in section 6297 does not apply to a dispute between a utility and a private developer. The court reasoned that the policy of insulating the taxpayers from the expense of utility relocations, to the extent it applied at all, favored PG&E in this situation, since its ratepayers "are comparable to taxpayers." (191 Cal.App.3d at pp. 236-237.) Having found the common law rule inapplicable, the court turned to cases considering which of two public entities should bear the cost of relocating utility facilities. (*Id.* at pp. 238-239.) In these cases, which expressly distinguished disputes involving a privately owned public utility operating under a franchise, the courts decided the costs of relocation were most appropriately imposed on the entity whose constituents benefitted from the project requiring the relocation. (*Northeast Sacramento etc. Dist.* v. *Northridge Park etc. Dist.* (1966) 247 Cal.App.2d 317, 320-321 [55 Cal.Rptr. 494]; *County of Contra Costa* v. *Central Contra Costa Sanitary Dist.* (1960) 182 Cal.App.2d 176, 179-180 [5 Cal.Rptr. 783].) In *Damé,* the developer and the residents of its subdivision were the primary beneficiaries of the road widening. (191 Cal.App.3d at p. 240.) The court concluded: "[W]here a private party, on its own initiative and not that of government, develops a parcel of land and thereby creates or aggravates a need for a public improvement which requires the relocation of existing

utility equipment, the private party shall bear the necessary relocation costs." (*Id.* at p. 242.)

The *Damé* analysis does not apply to this case. We are not presented with a dispute between a private developer and a utility; the First Street Developers are not parties to the litigation. This is a dispute between a city and a utility operating under a city franchise, subject to well-settled common law and statutory obligations. *Damé*'s broadly stated conclusion that privately instigated development must bear the costs of utility relocation is limited by the premise from which the court began: the common law and statutory rules governing payment for utility relocation do not apply when a *private party* seeks to make a utility pay for relocation (191 Cal.App.3d at p. 236).

We agree with Livermore, and with the trial court, that *Pacific Gas & Electric Co.* v. *City of San Jose, supra,* 172 Cal.App.3d 598 (*San Jose*) is the controlling precedent. There, the cities of San Jose and Mountain View created three assessment districts to help fund developments, at least one of which required street widening. The cities also contributed funds, apparently from general tax revenues. The projects required PG&E to relocate facilities operated under franchise agreements with the cities. PG&E sued for reimbursement from the assessment districts, proportional to each district's share of the total funding. The trial court dismissed the action after sustaining the cities' demurrers, and the Court of Appeal affirmed. (*Id.* at pp. 600, 602.)

PG&E contended the common law and section 6297 only prevent a utility from seeking reimbursement from municipal funds, not from assessments on private property collected by a city to pay for street work requiring utility relocation. (*San Jose, supra,* 172 Cal.App.3d at p. 601.) The court disagreed, observing that PG&E's obligation to pay for relocating its facilities arose from the paramount right of the people of Mountain View and San Jose to use the streets in the areas covered by the three projects. PG&E sought "to distinguish this general rule on a private versus public benefit theory, arguing the creation of special assessment districts to pay a portion of the three projects clearly designates the appropriate percentage of each project not benefitting the population as a whole." (*Id.* at p. 602.) The court's response to this argument is so pertinent to PG&E's claims on this appeal that it bears repeating at some length.

"A special assessment district is not a legal entity, but merely an area of land designated to receive benefits and improvements, and as such is specially assessed to pay for these benefits. The district is formed by resolution of the legislative body of the city or county within which it resides, and its

establishment is a result only of legislative power grounded in the taxing authority of the sovereign. (*Dawson* v. *Town of Los Altos Hills* (1976) 16 Cal.3d 676, 682-683 [129 Cal.Rptr. 97, 547 P.2d 1377].) An assessment district is usually created because the benefits created are totally or almost wholly local in nature, making it unjust for the general populace to be taxed for the entire cost. However, under certain circumstances, the legislature may determine a portion of the costs should be borne by the general population and paid out of the general tax fund for the benefit the general public derives. . . .

". . . The fact that assessment districts are created by the city or county as funding mechanisms for certain improvements does not justify an exemption to the clear cut public policy heretofore discussed. For example, it is conceivable that a county could divide its area into various assessment districts to pay for all public improvements and lower general property taxes.

"It is true that when assessment districts are created for only partial funding of the projects, an inference of partial private benefit arises. However, the fact the cities will contribute a portion of the funding leads to the inescapable conclusion of some public benefit flowing from these projects. We are aware of no authority allowing for partial reimbursement to the franchisee when any public benefit results from the improvements causing the relocation of utility equipment." (*San Jose, supra,* 172 Cal.App.3d at pp. 602-603.)

PG&E argues this case is different from *San Jose* because Livermore did not provide any general tax revenues but limited its contribution to TIF funds generated by fees imposed on private development. PG&E emphasizes the finding in the TIF ordinance that the fees bore "a fair and reasonable relationship to each such development's burden on, and benefit from, the City-wide circulation system improvements to be funded by this ordinance." PG&E asserts this legislative finding conclusively demonstrates that widening First Street conferred private benefits and that any public benefits were only incidental. Because Livermore insulated its taxpayers from the cost of the project by limiting its contribution to TIF funds, PG&E contends the purposes of section 6297 have been served and it should not have to pay for relocating its utility poles.

The argument is unconvincing. The legislative finding that fees generated by the TIF ordinance are reasonably related to the impact of the assessed developments on traffic throughout Livermore does not amount to a finding of only private benefit; clearly, the public also enjoys a substantial benefit from improvements in the city's traffic circulation system. The trial court

properly deemed TIF funds analogous to general tax revenues, in that they are city funds that could be spent on other traffic improvements throughout Livermore if not used for the First Street project. Moreover, funds collected from an assessment district cannot be said to generate only private benefits. While "a special assessment must confer a special benefit upon the property assessed beyond that conferred generally" (*Knox* v. *City of Orland* (1992) 4 Cal.4th 132, 142 [14 Cal.Rptr.2d 159, 841 P.2d 144]), it does not follow that the public benefit from the improvement financed by the assessment is merely incidental. In *Knox, supra*, the Supreme Court reaffirmed the principle, recognized over many years by both legislative and judicial decisions, that public parks are proper subjects for special assessment. (*Id.* at pp. 143-145.) A public park confers broad public benefits, even though it also confers special benefits on neighboring properties that justify the imposition of a special assessment.

As stated in *San Jose, ·supra*, a city's decision to create an assessment district as a funding mechanism does not justify an exception to the established rule that a utility's franchise to operate in public streets includes the obligation to pay for relocating its equipment when required by municipal improvements. This conclusion flows from recognition of the public's superior right to use the streets. (172 Cal.App.3d at p. 602.) The fact that use of TIF funds and special assessments confers benefits that are partially private in nature does not create any right of reimbursement for utility relocations. (*Id.* at pp. 602-603.) Such funds are municipal resources; that they were originally acquired from private developers does not change their character. They are public funds, generated for governmental purposes by the exercise of the city's legislative authority to levy taxes. Such methods of raising funds for public improvements benefit the taxpayers by reducing their general tax burden. (*Id.* at p. 602.) PG&E did not seek payment from the private funds of the First Street Developers for moving its poles. It contended Livermore should provide funds from the assessment district. Livermore's payment was an "expense to the municipality" for which it is entitled to reimbursement under section 6297 and the common law.

First Street is a major traffic artery in Livermore. It connects two parts of the community divided by Interstate 580 and serves travelers entering and leaving the city. The general public benefit from widening First Street is obvious and in itself exposes the strained technicality of PG&E's arguments. PG&E's right to maintain its facilities along First Street must yield to the paramount right of public street use. The fact that private development aggravated the need for street expansion is not dispositive. The trial court's judgment was correct.

*Disposition*

The judgment is affirmed. Livermore shall recover its costs on appeal.

Phelan, P. J., and Walker, J., concurred.

A petition for a rehearing was denied January 31, 1997.