[S. F. No. 8771. In Bank.—October 25, 1918.]

BALDWIN VALE, Respondent, v. THOMAS F. BOYLE, as Auditor, etc., et al., Appellants.

MUNICIPAL CORPORATIONS—SAN FRANCISCO—PURCHASE OF EQUIPMENT FOR PUBLIC UTILITY — AUTHORITY OF BOARD OF PUBLIC WORKS— CONSTRUCTION OF CHARTER.—The provisions of the charter of the city and county of San Francisco (section 9, subdivision 8, chapter I, article VI) giving the board of public works charge, superintendence, and control of all public utilities owned or operated by the city, authorizes such board to purchase under a directory ordinance of the board of supervisors automobile buses as equipment to be used as a public utility, and the limitations contained in section I, chapter 3, article II, of the charter relating to the purchase of supplies and other articles by the board of supervisors, do not apply to such purchases.

APPEAL from an order of the Superior Court of the City and County of San Francisco granting an injunction *pendente lite*. George E. Crothers, Judge. Reversed.

The facts are stated in the opinion of the court.

George Lull, City Attorney, and Frank English, John B. Gartland, and Oscar T. Barber, for Appellants.

John L. McNab, and Byron Coleman, for Respondent.

Robert M. Searles, *Amicus Curiae*.

WILBUR, J.—This is an appeal from an order granting an injunction *pendente lite*, restraining the auditor of the city and county of San Francisco from issuing his warrant in payment for certain White automobile buses purchased by the board of public works of said city, after advertisement inviting bids, as directed by ordinance of the board of supervisors of said city. The main point involved in the case is the construction of the charter of the city and county of San Francisco with reference to the acquisition of equipment for the extension of a public utility owned and operated by the city. Respondent contends that the power to purchase such equipment is vested in the board of supervisors and must be exercised under the provisions of section 1, chapter 3, article II, of the charter (Stats. 1899, p. 255), and that such charter power cannot be delegated by the supervisors to the board of public works. Appellants contend that by virtue of section 9, subdivision 8, of chapter 1, article VI, of said charter (Stats. 1899, pp. 286, 287), the supervisors had authority to direct the purchase by the board of public works of the automobile buses as equipment to be used as a public utility. That section provides as follows:

"Sec. 9. The board of public works shall have charge, superintendence and control, under such ordinances as may from time to time be adopted by the supervisors: . . .

"8. Of any and all public utilities, owned or operated by the city and county, or which may hereafter be so owned, controlled or operated."

The charter, as originally adopted in 1899, provided in article XII thereof for the acquisition of public utilities. The automobile buses were purchased for the purpose of extending the service of an existing public utility which was expressly authorized by the provisions of article XII, section 16, subdivision d, incorporated into the charter by amendment in 1907 (Stats. 1909, Second Ex. Sess. 1907, p. 37), which reads as follows:

"Section 16. 1. Whenever any public utility shall be operated by the City and County . . . the supervisors may, from time to time, make appropriations from such funds for the following purposes . . . (d) for extensions and improvements."

Section 14 of the same chapter, added by amendment at the same time, provided as follows:

"Power to acquire public utilities.

"Section 14. The City and County shall have power to acquire, construct or complete any public utility from funds derived from taxes levied for that purpose, or from funds derived from the sale of bonds issued for that purpose, as is provided in this charter and may operate, maintain, sell or lease the same, subject to the other provisions and limitations of this charter."

Full power, therefore, is given by the charter to the city "to acquire, construct or complete any public utility" (section 14, *supra*) and to utilize certain funds for the purpose of purchasing equipment for extensions and improvements. "Charge, supervision and control" of such public utilities are vested by the charter in the board of public works, under such ordinances as may from time to time be adopted by the supervisors. In the absence of any provision to the contrary in the charter these provisions, no doubt, authorize the purchase by the board of public works of equipment from funds appropriated therefor by the board of supervisors in the manner provided by the ordinances adopted "from time to time" by the said board of supervisors. But respondent contends that the direct and implied authority derived from the provisions of section 9, subdivision 8, of chapter 1, article VI, *supra*, is controlled by the provisions of the charter, specifically providing for the purchase of supplies and other articles, and directing that the same shall be purchased by contract awarded to the lowest bidder, after advertisement inviting bids therefor. These provisions (section 1, chapter 3, article II, *supra*) are as follows:

"Contracts.

"Section 1. All contracts for goods, merchandise, stores, supplies, subsistence or printing for the city and county, as well as for all subsistence, supplies, drugs and other necessary articles for hospitals, prisons, public institutions and other departments not otherwise specifically provided for in this charter, must be made by the supervisors with the lowest bidder offering adequate security after publication for not less than ten days in the official newspaper; and no purchase thereof or liability therefor shall be made or created except by contract.

"Except as otherwise provided in this charter, the board must determine annually what goods, merchandise, stores, supplies, drugs, subsistence and other necessary articles will be needed by the city and county for the ensuing year, and it shall have no power to purchase or to pay for the same unless the provisions in this charter provided as to competitive bidding for supplies are strictly followed, and no contract shall be made for any of the same unless upon such competitive bidding.''

It is contended that the automobiles in question are "other necessary articles for . . . other departments not otherwise specifically provided for in the charter," and that, therefore, this section relating to the purchase of such articles controls, for the reason that there is no specific provision in the charter for the purchase of "articles" for the equipment of a public utility. In considering this contention it should be observed that the section deals with the purchase of supplies used by the city in its various departments and institutions by means of annual contracts for such supplies. The duty of the board of supervisors to determine annually in advance "what goods, merchandise, stores, supplies, drugs, subsistence and other necessary articles will be needed by the city for the ensuing year" is as imperative as the duty to purchase from the "lowest bidder" after advertisement unless otherwise provided in the charter. "It shall have no power to purchase or to pay for the same unless the provisions in this charter provided as to competitive bidding for supplies are strictly followed, and no contracts shall be made for any of the same unless upon such competitive bidding." "All contracts . . . must be made by the supervisors with the lowest bidder offering adequate security, after publication for not less than ten days in the official newspaper, and no purchase thereof or liability therefor shall be made or created except by contract." The language of the second sentence of section 1 is almost identical with the first sentence as to the character of goods, etc. Each applies to "goods," "merchandise," "stores," "supplies," "drugs," "subsistence," and "other necessary articles." The first sentence provides for the purchase of such "supplies for hospitals, prisons, public institutions and other departments not otherwise specifically provided for in this charter." While the last sentence uses the shorter form of expression "needed by the

city and county for the ensuing year." Under the doctrine *ejusdem generis* the words "other necessary articles" used in the second sentence should be construed as applicable only to things of the same general nature or class as those enumerated, namely, supplies of such a general nature used by the city as the board might anticipate and "determine annually in advance" to be so required, and the same words in the first sentence, used in the same connection, should receive the same interpretation. Although this precise question has not been heretofore determined by this court, a similar provision of the Political Code and the County Government Act have been passed upon by the courts of this state. Section 8, subdivision 21, of the County Government Act of 1897 (Stats. 1897, pp. 452, 464) provides as follows: (Italics ours.)

"21. The board of supervisors of the several counties shall *annually* advertise for at least ten days in a newspaper of general circulation in the county (if there be a newspaper published in the county; otherwise by posting notice in three public places) for sealed bids for furnishing the county with stationery, clothing, bedding, groceries, provisions, drugs, medicines and *all other supplies.* All bids shall be on a schedule showing *all articles* needed in the several offices and departments, prepared by the clerk of the board and shall state separately the price of each article to be furnished, and any person may bid upon any article separately. In considering such bids the board may accept or reject all or any of them, or may accept or reject a part of any such bid, preference being given, however, to the lowest responsible bidder. All supplies furnished the county or any officer thereof shall be furnished at a price no greater than specified in the bid which may be accepted by the board.

"The board shall annually fix the price at which the county shall be supplied with job printing and blank books from a schedule prepared by the clerk of the board," etc.

It will be observed that this section, literally construed, required the board of supervisors to annually advertise "for all other supplies" furnished the county. In *Swasey* v. *County of Shasta,* 141 Cal. 392, 395, [74 Pac. 1031, 1033], in considering the authority of the county to erect a fence, and in analyzing the provisions of the County Government Act, it is said: "Subdivision 21 requires that all ordinary county supplies shall be bought after advertisement for sealed bids."

This same subdivision was later passed upon by the appellate court of the second district in *County of Riverside* v. *Yawman & Erbe Mfg. Co.,* 3 Cal. App. 691, [86 Pac. 900], where it was insisted that the board of supervisors were required to advertise for furnishings for a county courthouse. The court there said: "It is insisted that furnishings for a court-house are 'other supplies' within the meaning of the law, and that there being no publication or bids therefor, or schedule prepared as provided, the purchase and payment were, there-fore, without authority of law. We are of the opinion that from a reading of the whole subdivision, it is apparent that the term 'other supplies' has reference to ordinary supplies which the board is required to keep for use and replenish annually, if needed, for distribution among the county officers; that furniture for courthouse is not in the contemplation of such act 'ordinary supplies.' " It was further said: "This construction is accentuated by subdivision 8 of section 25 of the same act, which confers express authority upon the board to erect, rebuild or furnish a courthouse, and with reference to which furnishing no publication or competitive bidding is *expressly* provided. (Italics ours.) In addition, the board, by virtue of section 4 of the act, is given authority generally to purchase such personal property as may be necessary in the exercise of its power." A similar question was presented in *People* v. *Nellis,* 14 Cal. App. 250, [111 Pac. 631]. It is there said: "It is averred that the supervisors advertised for bids; that the same were received; that one bidder offered to supply the needed furnishings for one hundred and fifty thousand dollars, while another bid therefor two hundred and forty-seven thousand seven hundred dollars; that the goods so to be furnished under such respective bids were in quality, texture and workmanship the same. It is further averred that the notice given soliciting such bids, and the specifica-tions in said notice referred to and made part thereof, were uncertain in their terms and provided no data upon which intelligent bids could be made. That it was required of the bidders that they furnish their own plans, and in addition give bonds indemnifying the county against all damages for infringement of patents caused by suit or otherwise, all of which it is averred increased the cost of material and fur-nishings; that when said bids were received the board awarded the contract to the highest bidder."

It will be observed that the situation described in the complaint in that case is almost identical with the complaint made here. That after advertisement on insufficient specifications bids were received from contractors upon their own plans, and that the contract was awarded "to the highest bidder." The court there held that under the provisions of the County Government Act, hereinbefore quoted, "that the board of supervisors may in their discretion go into the open market and purchase supplies for a public building, where such furnishings form no part of the structure is not disputed. Their authority so to do is determined in *Sarver* v. *County of Los Angeles,* 156 Cal. 188, [103 Pac. 917]; *Riverside* v. *Yawman-Erbe Mfg. Co.,* 3 Cal. App. 691, [86 Pac. 900]." In *Sarver* v. *County of Los Angeles, supra,* it was held that the cells of the county jail were a part of the jail furnishings. The court there said: "In the matter of furnishings, something from the necessities of the case must be left to the sound judgment and honest discretion of the board of supervisors. Desks, chairs, book-shelves, carpets, light-fixtures, etc., are of different prices and quality. Many of such articles are manufactured under patents and could be procured but from one source. It would be practically impossible to call for the furnishing of a building under pre-adopted plans and specifications adequate to exclude the necessary play of discretion and judgment, and, as we have said, the law has not undertaken so to hamper the boards of supervisors in the performance of this important duty. In the case at bar it may well be, as the appellants plead, that, notwithstanding the Pauly Jail Building Company's bid was higher in terms of money, it was still the lowest and the best in consideration of the quality of work, of material to be used, and of patented devices to be employed. That such patented devices may be considered, and, indeed, called for by the board of supervisors, is well settled. (*Nicolson Pavement Co.* v. *Painter,* 35 Cal. 697, 699; *Dunne* v. *Altschul,* 57 Cal. 472.)" At the time this decision was rendered, subdivision 21, section 25 (Stats. 1897, p. 464, *supra*), read substantially as above quoted. In that case the contract had been awarded to the highest bidder, whose bid was alleged to have been over six thousand dollars in excess of that of the lowest responsible bidder, the supervisors justifying themselves on the ground that the furnishing of cells required the use of patented locking devices, etc.,

and that, therefore, they exercised a proper discretion in awarding the contract to the highest bidder. Apparently the attention of the court was not called to the section of the County Government Act requiring "all other supplies" to be purchased after advertisement, and for that reason the case is not direct authority for the precise point involved here. That section 1, *supra,* was not intended, in the first instance, to apply to the purchase of equipment for the improvement or extension of public utilities is manifest by the fact that the authority to purchase such equipment and supplies was conferred by amendment to the charter in 1907, while the restrictions of section 1 were embodied in the original charter of 1899, which was a modification of the previous consolidation act adopted and in force in the city and county of San Francisco ever since 1856 [Stats. 1856, p. 164]. This section provided as follows:

"Section 69. All contracts for building and printing to be done for such city and county and ordinary supplies for subsistence and prisoners must be given by the board of supervisors to the lowest bidder offering adequate security, after due notice published for not less than five days in at least two newspapers in such city and county." At the time, then, when the charter was adopted, the words, "other necessary articles for . . . other departments . . . " did not include automobile buses purchased for the equipment for an extension or improvement of a public utility. If, however, the amendment of 1907 referred to and incorporated therein by reference the general plan of purchasing of supplies contained in section 1, *supra,* then, of course, such provision would be controlling. The question, then, is, Do the words "as is provided in this charter," contained in section 14, hereinbefore set forth, relate to the "acquiring, constructing, or completing" a public utility, or to the method of acquiring funds for that purpose? It is clear, we think, that they apply to the latter, and not the former. The considerations which led the court to hold that the requirement that contracts for "all other supplies" (section 25, subdivision 21, *supra*) be purchased from the lowest bidder did not limit the power of the county board of supervisors to purchase furniture and jail cells are much more persuasive when applied to the situation presented by the instant case. For, under the charter provisions concerning public utilities, the city and county of San

Francisco, through its board of public works, is acting in a proprietary and not in a governmental capacity, and it may well be assumed that in placing such utilities in charge of one of the boards of the city, it was contemplated that so far as consistent such board should have the usual powers incidental to the operation of such public utility, including the power to purchase the necessary supplies and equipment, this power to be exercised under the charter of the city of San Francisco by the board of public works, under such limitations as may from time to time by ordinance be prescribed by the board of supervisors. (Charter, section 9, subdivision 8.) While it is true that this general consideration alone should not control the express language of section 1, chapter 3, article II, of the charter, if applicable thereto, it aids us in construing such general provisions of the charter concerning the purchase of supplies, etc., to consider that they were adopted for the purpose of regulating the conduct of the board of supervisors of San Francisco, acting in their governmental capacity. The foregoing considerations and authorities lead to the conclusion that the charter provisions giving the board of public works "charge, superintendence and control" of public utilities authorized them to purchase, in conformity with the ordinance of the board of supervisors, the automobile buses in question, and that the limitations contained in section 1, chapter 3, article II, do not apply to such purchases.

It is contended, however, that the board of public works did not purchase said automobile buses in the manner directed by the ordinance of the board of supervisors. The ordinance, by reference, incorporated therein the plans and specifications then on file in the office of the board of supervisors. These plans and specifications also provided for the submission by the bidders of their own detailed plans and specifications for automobile buses that would fill the general specifications of the board of supervisors as to power, capacity, etc. The bids were in exact accord with the ordinance of the board of supervisors, and the contract therefor was valid.

The order granting an injunction *pendente lite* is reversed.

Sloss, J., Richards, J., *pro tem.,* Melvin, J., Lorigan, J., and Angellotti, C. J., concurred.