**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY, a California public utility corporation; SOUTHERN CALIFORNIA GAS COMPANY, a California public utility corporation, | No. 22-55498<br><br>D.C. Nos.<br>8:20-cv-02186-DOC-KES<br>8:20-cv-02187-DOC-KES |
| *Plaintiffs-counter-defendants-Appellants*, | |
| v. | OPINION |
| ORANGE COUNTY TRANSPORTATION AUTHORITY, a public corporation, | |
| *Defendant-counter-claimant-Appellee*. | |

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted April 13, 2023
Pasadena, California

Filed March 13, 2024

Before:  Eric D. Miller and Salvador Mendoza, Jr., Circuit Judges, and Barry Ted Moskowitz,[*] District Judge.

Opinion by Judge Miller

## SUMMARY[**]

### Civil Rights/Takings

The panel affirmed the district court's summary judgment for the Orange County Transportation Authority (OTCA) in a 42 U.S.C. § 1983 action brought by two investor-owned utilities, Southern California Edison Company and Southern California Gas Company (collectively, the Utilities), alleging that they are entitled to compensation either under the Takings Clause or under state law for having to relocate their equipment from public streets to allow for the construction of a streetcar line.

The panel held that the Utilities were not entitled to compensation under the Takings Clause because they did not have a property interest under California law in maintaining their facilities at their specific locations in the face of OCTA's efforts to construct a streetcar line. The California Supreme Court recognized in *Southern California Gas Co. v. City of Los Angeles*, 329 P.2d 289 (Cal. 1958), that a public utility accepts franchise rights in public streets subject

---

[*] The Honorable Barry Ted Moskowitz, United States District Judge for the Southern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

to an implied obligation to relocate its facilities therein at its own expense when necessary to make way for a proper governmental use of the streets.

The panel rejected the Utilities' argument that constructing rail lines is *per se* a proprietary activity, not a governmental one. California common law has traditionally required utilities to bear relocation costs when governments construct subways, and there is no reason why above-ground rail lines should be treated differently. California law is consistent with traditional principles of property law, historical practice, and Supreme Court precedent.

The panel rejected the Utilities' supplemental state-law claim that California Public Utilities Code section 40162 places the costs of relocation on OCTA. That provision says nothing about imposing the costs of relocation on OCTA. Thus, section 40162 does not apply to OCTA's project.

---

**COUNSEL**

Julian W. Poon (argued), David A. Battaglia, James L. Zelenay, Jr., Patrick J. Fuster, and Adrienne M. Liu, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Plaintiffs-counter-defendants-Appellants.

David A. DeBerry (argued) and M. Lois Bobak, Woodruff Spradlin & Smart APC, Costa Mesa, California, for Defendant-counter-claimant-Appellee.

**OPINION**

MILLER, Circuit Judge:

When a government grants a utility permission to place pipes, transmission lines, or other equipment in a public right-of-way, it sometimes becomes necessary to move that equipment to allow the construction of roads, sewer systems, or other infrastructure. As the Supreme Court has explained, "the traditional common law rule" is that utilities are "required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities." *Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co.*, 464 U.S. 30, 35 (1983).

In this case, the Orange County Transportation Authority (OCTA) asked two investor-owned utilities, Southern California Edison Company and Southern California Gas Company (collectively, the Utilities), to move their equipment from public streets to allow the construction of a streetcar line. The Utilities argue that the common-law rule applies only when the relocation is carried out for "governmental" purposes and that a streetcar line is a "proprietary" function for which compensation is required. We disagree, and we conclude that the Utilities are not entitled to compensation either under the Takings Clause or under state law. We affirm the judgment of the district court.

I

OCTA is a public agency established by the California Legislature to address "[p]ublic demand for an efficient public transportation system in the southern California region." Cal. Pub. Util. Code § 130001(a); *see* 1991 Cal. Stat. 3356–57. In 2016, OCTA began construction of a 4.15-

mile streetcar line connecting downtown Santa Ana with the Santa Ana Regional Transportation Center and another transportation hub in the nearby city of Garden Grove.

The project required the Utilities to relocate pipes, transmission lines, and other equipment from the streetcar's route. The Utilities have maintained that equipment in the streets of Santa Ana since 1937 and 1938, when they signed franchise agreements with the city permitting them to lay "poles, wires, conduits and appurtenances . . . in the public streets," and, in exchange, promised to pay the city 2 percent of their annual receipts "arising from the . . . franchise."

Southern California Edison forecast that complying with OCTA's relocation requests would cost about $8.8 million; Southern California Gas projected costs of $6.35 million. OCTA agreed to advance the Utilities their relocation costs while reserving the right to demand that the costs should ultimately fall on the Utilities.

The Utilities then brought suit under 42 U.S.C. § 1983, alleging that the relocation constituted a taking of private property requiring just compensation under the Fifth and Fourteenth Amendments. Separately from their constitutional argument, the Utilities argued that California Public Utilities Code section 40162 places the costs of relocation on OCTA. OCTA counterclaimed for the funds it had advanced the Utilities, plus interest. The parties filed a joint stipulation of undisputed facts and cross-moved for summary judgment.

The district court granted summary judgment for OCTA, ordering the Utilities to repay all costs that OCTA had advanced and determining that OCTA has no further liabilities. The district court did not award interest.

The district court began its analysis of the Utilities' takings claim by explaining that even a physical invasion of property by the government will not constitute a taking if it is "consistent with longstanding background restrictions on property rights." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021). The district court observed that "[u]nder the traditional common law rule, utilities have been required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities." *Norfolk Redevelopment & Hous. Auth.*, 464 U.S. at 35. But that common-law rule does not apply, the district court explained, when the government demands relocation "not in its governmental capacity—an exertion of the police power—but in its 'proprietary or quasi private capacity.'" *City of Los Angeles v. Los Angeles Gas & Elec. Corp.*, 251 U.S. 32, 38–39 (1919).

The district court noted that "the caselaw is not particularly clear on where to draw the line between 'proprietary' and 'governmental' purposes," and it applied three tests for distinguishing governmental and proprietary functions. It concluded that under each test, OCTA's streetcar project was governmental. First, a project might be governmental if it is "required in the interest of the public health and welfare." *New Orleans Gaslight Co. v. Drainage Comm'n of New Orleans*, 197 U.S. 453, 474 (1905). And "the California legislature has made numerous findings that construction of mass transit systems is necessary to address" environmental harms and mobility needs.

Second, governmental projects might be those that are "(1) essential or necessary for the government to perform, or (2) traditional for the government to perform." *Riverside Cnty. Transp. Comm'n v. Southern Cal. Gas Co.*, 268 Cal. Rptr. 3d 196, 230 (Ct. App. 2020). The district court agreed

with OCTA that "mass transit projects are exclusively a government function, and operate at a loss using heavy government subsidies."

Third, the district court considered "whether there is statutory authority for the government entity to use the streets in the contested manner." The district court noted that the California Legislature has granted OCTA the authority to administer light rail systems. *See* Cal. Pub. Util. Code § 130001.

After concluding that the Takings Clause did not require OCTA to pay the Utilities' relocation costs, the district court determined that California Public Utilities Code section 40162 did not shift the costs to OCTA. Section 40162, enacted as part of the Orange County Transit District Act of 1965, provides that the Orange County Transit District "may exercise the right of eminent domain" and that "[t]he district in exercising such power shall . . . pay the cost of removal, reconstruction or relocation of any structure," including "pipes, conduits, cables, or poles." 1965 Cal. Stat. 4384.

The district court concluded that section 40162 circumscribed only the Orange County Transit *District*'s powers and not those of OCTA. California Public Utilities Code section 130241 states that "[a]ll the provisions of the Orange County Transit District Act of 1965 . . . shall be equally applicable to the Orange County Transportation Authority." But the same section later provides that "[t]he authority shall determine which provisions are applicable to the authority." For that reason, the district court determined that "the provisions of the Orange County Transit District Act apply to OCTA only when OCTA determines that they apply," and here, it concluded, "OCTA has made no such determination."

## II

The Takings Clause of the Fifth Amendment, made applicable to the States by the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend V; *see Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 247 (1897). Ordinarily, government action that "physically appropriates" property is treated as "a *per se* taking" requiring just compensation. *Cedar Point Nursery*, 594 U.S. at 149.

But before deciding whether the government has taken a property interest, we first must determine whether any property interest exists. *See Wells Fargo Bank, N.A. v. Mahogany Meadows Ave. Tr.*, 979 F.3d 1209, 1214 (9th Cir. 2020) ("The State cannot take what the owner never had."); *see also Vandevere v. Lloyd*, 644 F.3d 957, 963–64 (9th Cir. 2011). "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)); *accord Stop the Beach Renourishment, Inc. v. Florida Dep't of Env't Prot.*, 560 U.S. 702, 707 (2010) ("Generally speaking, state law defines property interests."). Our inquiry is not limited to state law, however, or else "a State could 'sidestep the Takings Clause by disavowing traditional property interests' in assets it wishes to appropriate." *Tyler v. Hennepin County*, 598 U.S. 631, 638 (2023) (quoting *Phillips*, 524 U.S. at 167). So, we must look as well to "'traditional property law principles,' plus historical practice and [the Supreme] Court's precedents." *Id.* (quoting *Phillips*, 524 U.S. at 167).

With that understanding in mind, we consider whether the Utilities have a property interest in maintaining their facilities at their specific locations in the face of OCTA's efforts to construct a streetcar line. We first examine that question under California property law and then consider traditional property-law principles, historical practice, and precedent.

A

California law does not give the Utilities the property interest that they assert. More than fifty years ago, the California Supreme Court recognized in *Southern California Gas Co. v. City of Los Angeles* that "it has generally been held that a public utility accepts franchise rights in public streets subject to an implied obligation to relocate its facilities therein at its own expense when necessary to make way for a proper governmental use of the streets." 329 P.2d 289, 290 (Cal. 1958). The Utilities acknowledge that rule but insist that OCTA's streetcar line is not a "governmental" project. As *Southern California Gas* demonstrates, however, that proposition is not consistent with California law.

In *Southern California Gas*, the California Supreme Court considered whether Los Angeles owed Southern California Gas Company compensation for the costs of relocating to make way for a city sewage project. 329 P.2d at 290. The court held that no reimbursement was owed. In reaching that conclusion, the court did not expressly define the term "governmental." But it explained that the power to make utilities bear the costs of relocation for governmental projects originates in the "paramount right of the people as a whole to use the public streets wherever located." *Id.* at 291. The court also relied on the State's general police power, *id.* at 291–92, which authorizes the State to pursue "the

preservation of the public peace, safety, morals, and health" and, more generally, "the promotion of the public welfare," *Miller v. Board of Pub. Works of City of L.A.*, 234 P. 381, 383 (Cal. 1925). Based on those principles, the court deemed it sufficient that the project "invoke[d] the public right for the public benefit." *Southern Cal. Gas*, 329 P.2d at 291.

OCTA's streetcar line easily satisfies that standard. In building the streetcar line—that is, in making use of the public streets of Orange County—OCTA exercised its state-delegated authority to meet the "demand for an efficient public transportation system in the southern California region," "reduce the levels of automobile-related air pollution," and "offer adequate public transportation to all citizens, including those immobilized by poverty, age, physical handicaps, or other reasons." Cal. Pub. Util. Code § 130001(a), (b), (e). In other words, OCTA invoked the public right to use the streets for the public benefit.

The Utilities do not meaningfully argue that OCTA's streetcar line fails to serve a public interest. Instead, they maintain that it is "settled" that constructing rail lines is *per se* a proprietary activity, not a governmental one. That is incorrect. When the court in *Southern California Gas* described "the established rule that a utility's rights in the public streets are taken subject to the paramount right of public travel," it said nothing to suggest that such travel must be by car rather than by rail. 329 P.2d at 291. To the contrary, in a long list of cases exemplifying governmental functions, the court cited two cases from other States in which utilities were required to pay relocation costs to make way for rail lines. *See id.* at 290 (citing *In re Delaware River Joint Comm'n*, 19 A.2d 278, 280 (Pa. 1941); *Natick Gaslight Co. v. Inhabitants of Natick*, 56 N.E. 292, 293 (Mass. 1900)).

Significantly, in 1937—the same year that the Utilities signed their first franchise agreement with the City of Santa Ana—the California Legislature passed the Franchise Act, which required utilities to "remove or relocate without expense to the municipality any facilities . . . when made necessary by any lawful change of grade, alignment, or width of any public street . . . including the construction of any *subway* or viaduct, by the municipality." Cal. Pub. Util. Code § 6297 (emphasis added); *see* 1937 Cal. Stat. 1781, 1785. That statute does not directly resolve this case because OCTA is not a "municipality." But the California Supreme Court has explained that "most of the provisions" of the statute should be understood as declaratory of the common law. *Los Angeles Cnty. Flood Control Dist. v. Southern Cal. Edison Co.*, 333 P.2d 1, 5 (Cal. 1958). The statute thus supports the conclusion that California common law has traditionally required utilities to bear relocation costs when governments construct subways. The Utilities do not offer, and we do not see, any reason why above-ground rail lines should be treated differently.

The Utilities' narrow characterization of governmental functions is even more clearly inconsistent with more recent California cases. As one California court has observed, "[a] review of the cases interpreting . . . the common law indicate an almost unanimous refusal to allow utility company franchisees to recover reimbursement for equipment relocation expenses." *Pacific Gas & Elec. Co. v. City of San Jose*, 218 Cal. Rptr. 400, 401–02 (Ct. App. 1985). Indeed, the California Court of Appeal recently held that "[w]hatever local government is authorized to do constitutes a function of government," not a proprietary function, so that *any* valid exercise of governmental power places relocation costs on utilities. *Riverside Cnty. Transp. Comm'n*, 268 Cal. Rptr. 3d

at 232 (alteration in original). We need not decide whether the California Supreme Court would embrace that broad proposition or whether, if it did, it would "contraven[e] established property law" that existed at the time the Utilities were granted their franchises. *Stop the Beach Renourishment*, 560 U.S. at 733. For present purposes, it suffices to observe that neither current nor historical California law has embraced the proposition that the construction of rail lines is *per se* non-governmental.

In contending that constructing rail lines is a proprietary function under California law—or, at least, that it was a proprietary function at the time the Utilities signed their franchise agreements in the late 1930s—the Utilities rely heavily on two California Court of Appeal cases. Neither supports their argument.

In *Postal Telegraph-Cable Co. v. City & County of San Francisco*, the California Court of Appeal held that San Francisco owed an electric utility compensation for the cost of relocating to make way for a "municipal street railway system" because, the court noted, "it is conceded . . . that the city and county of San Francisco, while engaged in the operation of its municipal street railway system, is acting in a proprietary and not in a governmental capacity." 199 P. 1108, 1109 (Cal. Ct. App. 1921). In support of that proposition, the court relied on an earlier decision holding that "under the charter provisions concerning public utilities, the city and county of San Francisco, through its board of public works, is acting in a proprietary and not in a governmental capacity" when purchasing and operating buses. *Vale v. Boyle*, 175 P. 787, 790 (Cal. 1918); *see Postal Tel.-Cable*, 199 P. at 1109.

The Utilities read *Postal Telegraph-Cable* as holding that "the construction and operation of a municipal railway system is a 'purely proprietary activity.'" (quoting *Postal Tel.-Cable*, 199 P. at 1110). But that case, like *Vale*, on which it relied, held only that "*the city and county of San Francisco*" acted in a proprietary capacity when administering trains and buses. *Postal Tel.-Cable*, 199 P. at 1109 (emphasis added). The courts in those cases so held not on the basis of any general, cross-jurisdictional rule that trains are always proprietary, but rather based on a construction of San Francisco's "charter provisions concerning public utilities." *Vale*, 175 P. at 790.

In consulting the city charter to determine whether the transit project was governmental or proprietary, the courts were simply applying the rule that whether a municipal activity is governmental or proprietary turns partly on whether a municipality is authorized to exercise the State's police powers—that is, on whether a municipality has pursued a project in its capacity as an "instrumentality intrusted by the state with the subordinate control of some public affair." *Davoust v. City of Alameda*, 84 P. 760, 761 (Cal. 1906); *see also id.* (explaining that a city acts in a governmental character when it has been "made, by the state, one of its instruments, or the local depositary of certain limited and prescribed political powers, to be exercised for the public good on behalf of the state" (quoting John F. Dillon, 1 *Commentaries on the Law of Municipal Corporations* § 66, at 88 (3d ed. 1881))).

Those cases do not reflect "a view that operating a railway *could not* be a governmental action, only that it was not authorized by the municipal charter at issue in the case." *Riverside Cnty. Transp. Comm'n*, 268 Cal. Rptr. 3d at 240 (Raphael, J., concurring in part and dissenting in part). Here,

by contrast, it is undisputed that the California legislature established OCTA, and it expressly did so for the broad benefit of the region. *See* Cal. Pub. Util. Code. § 130001. *Postal Telegraph-Cable* is therefore inapposite.

The Utilities also rely on *Coleman v. City of Oakland*, in which the California Court of Appeal stated that Oakland's operation of its airport was a proprietary function because "[a]n air port falls naturally into the same classification as such public utilities as electric light, gas, water, and transportation systems, which are universally classed as proprietary." 295 P. 59, 61 (Cal. Ct. App. 1930). But that case concerned the city's tort liability, not an effort by the city to invoke the right at the core of a utility's obligation to bear relocation expenses: the "paramount right of the people as a whole to use the public streets wherever located." *Southern Cal. Gas*, 50 Cal. 2d at 717. The decision therefore sheds little light on OCTA's right to use the streets of Santa Ana for the public benefit.

## B

In denying the Utilities a property interest that would implicate the Takings Clause in these circumstances, California law is consistent with traditional principles of property law, historical practice, and Supreme Court precedent. As the Supreme Court has explained, "the traditional common law rule" is that "utilities have been required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities." *Norfolk Redevelopment & Hous. Auth.*, 464 U.S. at 35.

The Court recognized that rule more than a hundred years ago in *New Orleans Gaslight Co.*, in which New Orleans required a gas utility to relocate its facilities to

permit the construction of a drainage project. 197 U.S. at 459. The Court observed that nothing in the franchise agreement between the city and the utility indicated any "intention of the State to give up its control of the public streets." *Id.* Relocation costs therefore fell on the utility, as the city had the right to enact "proper regulations in the interest of the public health, morals, and safety." *Id.*

A few years later, in *Cincinnati, Indianapolis & Western Railway Co. v. City of Connersville*, a city laid a new road across the tracks of a privately owned railroad, and the Supreme Court held that the railroad could be required to pay the costs of building a bridge over the new road. 218 U.S. 336, 343–44 (1910). The Court explained that "[t]he railway company accepted its franchise from the State . . . subject necessarily to the condition that it would conform at its own expense to any regulations, not arbitrary in their character, as to the opening or use of streets, which had for their object the safety of the public, or the promotion of the public convenience." *Id.*

Those early precedents demonstrate that the Utilities are wrong to suggest that their franchises are subject only to what they call a "limited relocation obligation" that does not extend to relocating to permit the construction of a streetcar line. Instead, for more than a hundred years, utilities have been required to relocate to make way for a government that seeks to vindicate its right to use the streets and enact "proper regulations in the interest of the public health, morals, and safety." *New Orleans Gaslight*, 197 U.S. at 473. Indeed, about ten years before the Utilities accepted the franchises at issue here, a leading treatise on municipal powers explained that "[t]he grantee of a franchise to use the streets takes it subject to the right of the municipality to make public improvements whenever and wherever the public interest

demands" because "the grant of a franchise is subject to *any* proper exercise of the police power." 4 Eugene McQuillin, *The Law of Municipal Corporations* § 1806, at 793–94 (2d ed. 1928) (emphasis added). The construction of a streetcar line is just such an exercise. *See Northern States Power Co. v. Federal Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) (holding that a State did not need to reimburse a utility for the costs of relocating to avoid light-rail construction because the utility "merely had to move its facilities from one portion of the street to another, and such regulation is well within the state's police powers" (citation omitted)).

When it comes to a federal-law basis for their asserted property interest, the best the Utilities can offer is *City of Los Angeles v. Los Angeles Gas & Electric Corp.*, 251 U.S. 32, 39 (1919). In that case, a Los Angeles ordinance authorized the city to remove or relocate utility poles "when necessary" to allow it to construct a lighting system*. Id.* at 34. The Supreme Court held that the city committed a taking when it forced an electric street-lighting utility to remove its equipment so that the city could install its own utility serving the same function. According to the Court, the city's project was non-governmental because it was not a valid use of the State's police powers. In forcing the electric utility to relocate to make way for another electric utility, Los Angeles had identified "no real 'public necessity' arising from consideration of public health, peace or safety" because it had not pointed to any "disorder or overcharge of rates or peril, or defect of any kind" in the existing electric system that would make a new utility appropriate. *Id.* at 38. In fact, there was reason to suspect a self-serving motive because the city wanted to replace "what belongs to one lighting system in order to make way for another." *Id.* at 40.

The Utilities seize on the Court's use of the word "necessity," arguing that OCTA has failed to show that its streetcar satisfies any public necessity. On the strictest possible understanding of "necessity," it seems that few, if any, public projects would qualify—not even the sewer in *New Orleans Gaslight* or the road in *Cincinnati, Indianapolis & Western Railway. Cf. M'Culloch v. Maryland*, 4 Wheat. (17 U.S.) 316, 325 (1819) ("[I]f congress could use no means but such as were absolutely indispensable to the existence of a granted power, the government would hardly exist."). But we do not read *Los Angeles Gas & Electric* to invite us to make our own assessment of whether a streetcar line is or is not necessary for Orange County—the California Legislature, after all, believes that the project serves valuable public purposes, and the Utilities offer no reason for us to second-guess that judgment. *See* Cal. Pub. Util. Code § 130001. Instead, *Los Angeles Gas & Electric* stands for the same rule as the rest of the Supreme Court's cases in this line, and it is consistent with other cases evaluating whether a state or local entity is acting in a governmental or a proprietary capacity. *See, e.g.*, *Vale*, 175 P. at 790 (examining the City and County of San Francisco's charter to determine whether San Francisco was acting in a governmental capacity when it constructed a streetcar line).

The project at issue in *Los Angeles Gas & Electric* apparently lacked any public-facing rationale, and it therefore lost the status of "governmental." OCTA's project has no comparable defect, or at least none the Utilities identify. It is a governmental project that fits comfortably within a long tradition of relocations for which franchisees must foot the bill.

III

Separate from any argument under the Takings Clause, the Utilities also contend that the California Public Utilities Code places the costs of relocation on OCTA. We disagree.

Unlike the takings claim, over which we have federal-question jurisdiction, *see* 28 U.S.C. § 1331, the state-law claim is not independently subject to federal jurisdiction. Rather, the district court exercised supplemental jurisdiction over that claim because it is part of the "same case or controversy" as the federal claim. *See id.* § 1367(a). Ordinarily, "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see also* 28 U.S.C. § 1367(c). Here, we have affirmed the dismissal of the Utilities' federal claim. But whether to exercise supplemental jurisdiction over state-law claims after federal claims are dismissed is a matter of discretion, not subject-matter jurisdiction. *See Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc). We must accordingly decide whether to retain state-law claims according to "our normal rules of appellate procedure." *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1171 (9th Cir. 2001) (quoting *Government Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) (en banc)).

The parties in this case might have argued that the district court should dismiss the supplemental state-law claim under 28 U.S.C. § 1367(c) in the event that it dismissed the federal claim. But neither party so argued, either in the district court or before us. We decline to excuse the parties' forfeiture by *sua sponte* disclaiming supplemental jurisdiction over the state-law claim. *See Kohler*, 244 F.3d at 1171; *Doe by Fein v. District of Columbia*, 93 F.3d 861, 871 (D.C. Cir. 1996)

("The discretionary aspect to supplemental jurisdiction is waivable."). We therefore proceed to consider the merits of the state-law claim.

The Utilities focus on California Public Utilities Code section 40162, which provides that "[t]he district may exercise the right of eminent domain . . . . [But] the district in exercising such power shall . . . pay the cost of . . . relocation of any structure . . . mains, pipes, conduits, cables or poles of any public utility which is required to be moved to a new location." As is apparent from that statute's reference to "the district," the provision applies not to OCTA but to the Orange County Transit *District*, a separate regional transit entity. It appears in a part of the Public Utilities Code titled the "Orange County Transit District Act of 1965" (Transit Act). Cal. Pub. Util Code. §§ 40020–40617; 1965 Cal. Stat. 4384.

The Utilities argue that section 40162 nonetheless creates duties for OCTA because of a separate part of the Public Utilities Code, section 130241, which provides:

> All the provisions of the Orange County Transit District Act of 1965 . . . regarding the powers and functions of the Orange County Transit District shall be equally applicable to the Orange County Transportation Authority as if set forth herein, and shall be in addition to the powers and functions set forth in this division. The authority shall determine which provisions are applicable to the authority.

The Utilities' argument founders on the last sentence of that section: OCTA has not "determine[d]" that section 40162 shall "[be] applicable to" it. OCTA invoked a different

provision of the Transit Act, section 40180, as authority to build the streetcar line and force the Utilities to relocate. That provision says nothing about imposing the costs of relocation on OCTA. Thus, as the district court concluded, section 40162 does not apply to OCTA's project here.

The Utilities insist that section 40162 applies to OCTA because the provisions of the Transit Act "shall be equally applicable to" OCTA. Cal. Pub. Util. Code § 130241. They acknowledge that "the authority shall determine which provisions are applicable to the authority." *Id.* But, on the Utilities' account, the only role of that sentence is to block the application of those provisions that "by their nature may not be capable of being applied to OCTA."

The Utilities' reading is untenable because it effectively erases the last sentence of section 130241, in conflict "with the well-established principle that courts should, if possible, give meaning to every word of a statute and avoid constructions that make any word surplusage." *B.B. v. County of Los Angeles*, 471 P.3d 329, 337 (Cal. 2020). If a provision in the Transit Act is "not capable" of applying to OCTA, then OCTA has no need to "determine" whether the provision is applicable; the provision would not apply because it could not apply. In the same vein, we struggle to identify any provisions in the Transit Act that "by their nature may not be capable" of applying to OCTA. Under the Utilities' reading, then, the last sentence of the section has no function.

Insisting that their reading does not create this surplusage problem, the Utilities offer section 40161 as an example of a provision in the Transit Act that is not capable of applying to OCTA. Section 40161 authorizes "[t]he district" to "sue and be sued." Cal. Pub. Util. Code § 40161. The Utilities say

that OCTA "may not 'sue and be sued' in the name of [the Orange County Transit District]," so section 40161 cannot, by its nature, apply to OCTA. But that provision could apply to OCTA if the "the authority" were substituted for "the district." That is the exact substitution that the Utilities ask us to apply to section 40162.

The Transit Act includes a range of provisions that could, conceivably, apply to OCTA, such as a grant of power to enter into contracts, Cal. Pub. Util. Code § 41065, conflict-of-interest rules, *id.* § 40166, and a grant of eminent-domain authority, *id.* § 40175. If the last sentence of section 130241 adds anything, it must allow OCTA to determine, in its discretion, which provisions of the Transit Act—all of which are *potentially* applicable to OCTA—should in fact apply. OCTA has not chosen to subject itself to section 40162, so the Utilities' arguments about the duties imposed by that section are unavailing.

## IV

Finally, OCTA asks that we order an award of pre- and post-judgment interest. We decline to do so. Although its counterclaim asserted an entitlement to pre-judgment interest, OCTA did not mention interest in its motion for summary judgment. The district court did not award pre-judgment interest, and OCTA did not seek reconsideration under Federal Rule of Civil Procedure Rule 59(e). *See Osterneck v. Ernst & Whinney*, 489 U.S. 169, 177 (1989) (explaining that a "postjudgment motion for discretionary prejudgment interest is a Rule 59(e) motion"). More importantly for our purposes, OCTA has not cross-appealed the denial of pre-judgment interest, and we "may not alter a judgment to benefit a nonappealing party." *Lopez v. Garland*, 60 F.4th 1208, 1212 (9th Cir. 2023) (quoting

*Greenlaw v. United States*, 554 U.S. 237, 244 (2008)). On the other hand, because we affirm the district court's judgment, post-judgment interest is automatically available to OCTA, and there is no need for us to order it. 28 U.S.C. § 1961(a); Fed. R. App. P. 37(a); *see Waggoner v. R. McGray, Inc.*, 743 F.2d 643, 644 (9th Cir. 1984) ("Interest accrues from the date of a judgment whether or not the judgment expressly includes it . . . .").

**AFFIRMED.**